[No. B179921. Second Dist., Div. Three. Oct. 13, 2005.]

YOANN BOHBOT, Plaintiff and Appellant, v.
SANTA MONICA RENT CONTROL BOARD et al., Defendants and
Respondents.

459

COUNSEL

Law Offices of Gordon P. Gitlen, Gordon P. Gitlen; Law Offices of Rosario Perry and Rosario Perry for Plaintiff and Appellant.

Doris M. Ganga and Michaelyn Jones for Defendant and Respondent Santa Monica Rent Control Board.

Sonya Molho for Defendant and Respondent Susan Cope.

OPINION

**CROSKEY, Acting P. J.**—We are here called upon to interpret various provisions relating to Santa Monica's Rent Control Law (RCL), specifically those relating to owner-occupancy evictions in condominium units. The RCL was adopted in 1979. It provided that landlords could evict tenants for owner-occupancy. Under this initial version of the RCL, landlords were prevented from converting their apartments into condominiums unless they obtained removal permits.

Two important changes occurred in 1984. First, in May of that year, Santa Monica voters adopted a second means by which apartments could be converted into condominiums, the Tenant Ownership Rights Charter Amendment (TORCA). Under TORCA, a conversion could be accomplished without a removal permit if the tenants were offered an opportunity to purchase their units, and two-thirds of the tenants supported the conversion application. TORCA also granted a protection against owner-occupancy evictions to all tenants in the building *at the time of the conversion* who chose not to purchase.[1] With respect to the tenants who rented after the conversion, TORCA gave no protection, and the general provision of the RCL permitting owner-occupancy evictions applied.

Second, and also in 1984, the Santa Monica City Council became concerned that landlords were converting their buildings into condominiums *without* obtaining removal permits as required under the RCL. Some landlords took the position that they could simply subdivide their property into separate units, sell the interests in the individual units, and the new owners could then evict the tenants for owner-occupancy. To prevent this construction, and put buyers of illegally converted units on notice that they could not evict tenants for owner-occupancy, the city council adopted an ordinance that owner-occupancy evictions would be prohibited in all condominium units unless a removal permit had been obtained for the conversion. Shortly thereafter, in November of 1984, the voters incorporated this restriction into the RCL.

The dispute in this case involves the owner of a condominium unit legally converted under TORCA, who seeks to evict a tenant who was *not* in possession at the time of the conversion (i.e., a "nonparticipating tenant"). The landlord argues that owner-occupancy eviction is permitted under TORCA. The tenant, and the Santa Monica Rent Control Board (Board), say the eviction is impermissible, relying on the RCL provision prohibiting *all* owner-occupancy evictions in condominium conversions unless a removal permit has been obtained.

---

[1] Such tenants were defined as "participating tenants."

Based upon our review of the legislative history of the RCL amendments, we conclude that the RCL provision prohibiting owner-occupancy evictions in conversions, unless a removal permit has been obtained, was clearly intended to prohibit owner-occupancy evictions in *illegally converted* condominiums only, and therefore has no effect in this case, where the condominium was *legally converted* under TORCA.

We also conclude that a Board regulation prohibiting all attempts at owner-occupancy evictions for four years after the landlord voluntarily dismisses an attempt at owner-occupancy eviction is invalid as contrary to statutory law.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are not seriously in dispute. In 1992, a TORCA application was approved for the conversion of the condominium at issue. Defendant Susan Cope was not a tenant at the time of conversion. She became a tenant in 1994. In May 2003, plaintiff Yoann Bohbot purchased the condominium unit Cope was renting. Shortly thereafter, he served Cope with a 60-day notice to quit, based on owner-occupancy. In July 2003, Bohbot filed an unlawful detainer action against Cope, seeking possession of the unit. Unbeknownst to him, however, Bohbot's management company had continued to collect rent from Cope, thus invalidating his initial notice to quit. Therefore, on August 19, 2003, Bohbot dismissed the unlawful detainer action without prejudice.[2] On August 21, 2003, Bohbot served Cope with a second notice to quit, intending to start the owner-occupancy eviction proceedings again. Cope's attorney responded by letter asserting the notice to quit was invalid under the Board's regulation prohibiting a second attempt at owner-occupancy eviction within four years of the dismissal of a previous attempt.

Bohbot then brought the instant action against Cope and the Board, seeking a declaratory judgment that the regulation on which Cope relied was void. Bohbot sought summary judgment on this basis. The Board responded that the trial court need not consider the validity of the regulation. The Board argued that, regardless of the regulation, Bohbot would *never* be able to evict Cope for owner-occupancy due to the RCL provision prohibiting owner-occupancy evictions in all condominium units which had been converted without removal permits.

The trial court denied Bohbot's motion for summary judgment. Bohbot was permitted to file a first amended complaint which directly challenged the

---

[2] Bohbot alleged he dismissed the unlawful detainer action because his attorney had advised him that the collection of rent "had probably reestablished [Cope's] tenancy." Cope's counsel submitted a declaration suggesting Bohbot had dismissed the case rather than respond to Cope's motion to compel discovery.

applicability of the RCL provision, as well as the regulation. Cross-motions for summary judgment were filed.

The trial court granted summary judgment in favor of the Board, concluding that Bohbot was prohibited from evicting Cope for owner-occupancy because his condominium unit had been converted without a removal permit. Judgment was entered to that effect. Bohbot filed a timely notice of appeal.

## ISSUES ON APPEAL

There are two issues raised by this appeal. First, whether the RCL permits the owner of a condominium unit legally converted under TORCA to evict for owner-occupancy a tenant who was not a tenant in the unit at the time of the conversion. Second, whether the regulation prohibiting a second attempt at owner-occupancy eviction within four years after dismissal of an initial attempt, is invalid.

## DISCUSSION

### 1. Standard of Review

■ "The same rules of statutory interpretation that apply to statutory provisions also apply to local charter provisions." (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 221 [123 Cal.Rptr.2d 735].) ■ Interpretation is a question of law subject to independent judgment review. (*Id.* at pp. 219–220.) ■ Our primary duty when interpreting a statute is to determine and effectuate the Legislature's intent. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1382 [46 Cal.Rptr.2d 542]; *People v. Ramirez* (1995) 33 Cal.App.4th 559, 563 [39 Cal.Rptr.2d 374].) "When the language of a statute is clear and unambiguous, there is no need for interpretation and we must apply the statute as written." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra,* 39 Cal.App.4th at p. 1382.) " 'Words used in a statute . . . should be given the meaning they bear in ordinary use.' (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)" (*People v. Ramirez, supra,* 33 Cal.App.4th at p. 563.) "However, the ' "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose' and provisions relating to the same subject matter must be construed together and 'harmonized to the extent possible.' " (*In re Kali D.* (1995) 37 Cal.App.4th 381, 386 [43 Cal.Rptr.2d 581].) " ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.] The legislative purpose will not be

sacrificed to a literal construction of any part of the statute." (*Giles v. Horn, supra,* 100 Cal.App.4th at p. 220.)

## 2. *Owner-occupancy Eviction From TORCA Condominium Units*

We are concerned with the interpretation and interaction of several provisions of the Santa Monica Charter, as set forth in the RCL and TORCA. We first look at the plain language of the relevant provisions.

We begin with the relevant provisions from the *current* version of the RCL.

Santa Monica Charter section 1803, subdivision (t)(1)[3] provides, "Any landlord who desires to remove a controlled rental unit from the rental housing market by . . . conversion . . . is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with rules and regulations promulgated by the Board." Section 1813, however, provides, "Section 1803(t) of this Article shall not apply to any building for which approval has been received pursuant to [TORCA]. All other provisions of this Article, however, shall continue to apply with full force and effect to each unit in any building receiving approval pursuant to [TORCA]."

Section 1806, subdivision (a) sets forth the bases for which a landlord of a controlled rental unit may evict a tenant. Section 1806, subdivision (a)(8) allows evictions for owner-occupancy, but section 1806, subdivision (a)(8)(vi) provides, "No eviction [for owner-occupancy] shall be allowed in any condominium . . . which has been converted from an apartment or other rental unit after [the effective date of the RCL], unless the [Board] has issued a removal permit or declared a vested right for said unit."

Put simply, the plain language of the RCL provides that: (1) no conversion can be made without a removal permit; (2) no owner-occupancy eviction can be made from a condominium converted without a removal permit; but (3) TORCA conversions can be made without removal permits. To say the least, these provisions give rise to a potential ambiguity. Does the exemption of TORCA conversions from the removal permit requirement of section 1803, subdivision (t), exempt them from the removal permit prerequisite for owner-occupancy evictions of section 1806, subdivision (a)(8)(vi)? Or, in the alternative, does the exemption of TORCA conversions from the removal permit requirement *result* in their failure to meet the requirements for owner-occupancy evictions?

Certain provisions from TORCA are also relevant. Section 2001, subdivision (j) defines the term "participating tenant" as any tenant "residing in the building at the date of the approval of the [TORCA] application."

---

[3] All undesignated section references are to the Santa Monica Charter (Charter).

Section 2004, subdivision (b)(3) provides, "No participating tenant shall at any time after the approval of the [TORCA a]pplication be evicted for the purpose of occupancy by the owner . . . . In the event the participating tenant does not exercise his or her right to purchase within the time period set forth in [TORCA], the owner may transfer the unit without any price restriction to the participating tenant or any other person. However, in the event such transfer is to someone other than the participating tenant, the transfer shall be expressly made subject to the rights of the participating tenant to continue to occupy the unit as provided for in [TORCA]."

Section 2004, subdivision (b)(4) provides, "Each unit shall at all times remain subject to all terms and conditions of [the RCL], before, during and after any [TORCA c]onversion. If any unit is rented, the maximum allowable rent for each unit shall be no greater than the maximum allowable rent allowed under [the RCL]."

Section 2007 provides, "*Section 1803(t) of this Charter shall not apply to any building for which a [TORCA] Application has been approved.* Any provision of any ordinance of the City or any provision of the Municipal Code or any appendix thereto inconsistent with the provisions of this Article, to the extent of such inconsistency and no further, shall not apply to the extent necessary to effect the provisions of this Article." (Italics added.)

In sum, the plain language of TORCA protects "participating tenants" from owner-occupancy evictions, but gives no additional protections to "nonparticipating tenants." While the RCL, in general, applies to a TORCA conversion, TORCA conversions are expressly exempt from the RCL's removal permit requirement.

Considering the language of the RCL in conjunction with TORCA, the construction that best gives effect to all provisions is one which renders TORCA conversions exempt from the RCL provision requiring removal permits for owner-occupancy evictions from condominium units. The entire TORCA scheme was designed to create an alternative to the procedure of conversion by removal permit. If all TORCA conversion owners are required to obtain a removal permit in order to evict nonparticipating tenants for owner-occupancy, TORCA's advantage of bypassing the removal permit requirement disappears. This conclusion is supported by TORCA's express limitation on owner-occupancy eviction of *participating* tenants. Had the Santa Monica voters intended to prevent owner-occupancy eviction of *all* tenants in TORCA conversions, such a provision easily could have been

enacted as part of TORCA.[4] That the restriction on owner-occupancy eviction of all tenants is found in the RCL rather than TORCA supports the conclusion it was not meant to apply to TORCA conversions. It should logically follow that the RCL prohibition on owner-occupancy evictions in the absence of removal permits does not apply when TORCA has exempted the conversion from the removal permit requirement.

The Board, however, argues that this interpretation of the Charter provisions is erroneous. The Board contends that our interpretation of section 1806, subdivision (a)(8)(vi), as not applying to TORCA conversions effectively renders that provision a nullity. Indeed, the Board contends that section 1806, subdivision (a)(8)(vi) applies *only* to TORCA conversions, and suggests it was adopted as a response to TORCA, to give greater protection to nonparticipating tenants. We disagree.

The Board's argument is simply not supported by the relevant legislative history. On April 10, 1979, the voters of Santa Monica adopted article XVIII of the Charter, the RCL. The RCL applied to all "controlled rental units" in the city, including condominium units which were rental properties. It established limits on the rent which could be charged and the grounds on which tenants could be evicted. It also regulated the removal of controlled rental units from the housing market. The RCL was intended to respond to the housing shortage and rising rents that were becoming increasingly problematic to "the public health and welfare of Santa Monica tenants, especially the poor, minorities, students, young families, and senior citizens." (§ 1800.) As initially enacted by voters, the RCL allowed evictions for occupancy by the owner or the owner's relatives for *any* controlled rental units. (§ 1806, former subd. (h).) The RCL also provided that "any landlord who desires to remove a controlled rental unit from the rental housing market by . . . conversion . . . is required to obtain a permit from the Board prior to such removal . . . ." (§ 1803, former subd. (t).) The Board was permitted to approve a removal permit only if it found that removal of the unit would not adversely affect the City's low-income housing supply, if it would be economically infeasible for the landlord to retain and maintain the unit in

---

[4] TORCA's statement of purpose states, in pertinent part, "It is sound policy to encourage . . . Tenant-Participating Conversions to allow tenants to purchase the units which they occupy and, at the same time, protect tenants who do not purchase their units." (§ 2000, subd. (b).) The Board construes the phrase "protect tenants who do not purchase their units" to include nonparticipating tenants. This construction is not supported by the plain language of the article. "Participating tenants" are *all* tenants residing in the building at the time of the conversion, including those who purchase their units and those who do not. (§ 2001, subd. (j).) "[T]enants who do not purchase their units" *are* participating tenants. Nonparticipating tenants are those who rented their units *after* the conversion and, by definition, were not given the opportunity to purchase mandated by TORCA. In short, there is nothing in TORCA's statement of purpose that indicates an intent to provide additional protections for nonparticipating tenants.

habitable condition, or if the landlord intended to develop multifamily dwelling units, a minimum portion of which were to be low-income housing. (*Ibid.*)

Nearly five years later, on June 5, 1984, the Santa Monica voters adopted TORCA, which radically increased the number of conversions by allowing conversions without removal permits *if the tenants agreed.* Under TORCA, an application for condominium conversion had to be approved if tenants representing two-thirds of the units agreed to the conversion and tenants representing 50 percent of the units indicated their intent to purchase the units. (§ 2002, subds. (f) & (h).) TORCA specifically provided that RCL section 1803, subdivision (t), requiring removal permits for conversions, would not be applicable to TORCA conversions. (§ 2007.)

TORCA provided that each unit would remain subject to the provisions of the RCL (including those governing maximum rent) with the exception of the removal permit requirement. (§ 2003, subd. (b)(4).) TORCA provided additional protection for participating tenants in the event they declined to buy their units. Most important was that, under a TORCA conversion, participating tenants could *never* be evicted for owner-occupancy. (§ 2004, subd. (b)(3).) This protection was not extended to nonparticipating tenants, who would still be subject to eviction for owner-occupancy under the RCL. (See Santa Monica City Attorney Informal Opinion No. 84-57.)[5]

During the same five year period between the adoption of the RCL and the adoption of TORCA, building owners fought the restrictions of the RCL in court. Prior to the adoption of the RCL, building owners had been able to

---

[5] The parties to this appeal make much of this city attorney opinion. Its relevance is minimal. While subdivision (b)(3) of section 2003 of TORCA protected all *participating tenants* from owner-occupancy evictions *indefinitely*, subdivision (b)(7) of that section protected *senior citizen and disabled participating tenants* from owner-occupancy evictions *indefinitely*, and all *other participating tenants* from owner-occupancy evictions for *five years*. A city councilmember sought clarification from the city attorney of these apparently contradictory provisions. On May 21, 1984, the city attorney issued an informal opinion, indicating that subdivision (b)(7) was a fail-safe provision which would take effect only if the RCL were inoperative. This view was set forth in the city attorney's analysis of Proposition X (which enacted TORCA) which appeared in the June 5, 1984 voter's pamphlet. Subsequently, subdivision (b)(7) of section 2003 was amended to explicitly state, "This subsection shall be interpreted in accordance with Santa Monica City Attorney Informal Opinion Number 84-57. All amendments to this Subsection are declaratory of existing law." The parties dispute the effect of this explicit reference to the city attorney's opinion, given that, in the course of the city attorney's opinion, the city attorney noted that subdivision (b)(3)'s indefinite protection against owner-occupancy evictions of participating tenants did not extend to nonparticipating tenants. But it is clear that the inclusion of the reference to the city attorney's opinion in subdivision (b)(7) of section 2003 is meant to refer to the actual *holding* of the city attorney's opinion, regarding subdivision (b)(7)'s existence only as a fail-safe, and not the city attorney's mention that subdivision (b)(3) did not apply to nonparticipating tenants.

convert their apartment buildings into condominiums simply by obtaining planning commission approval of their tentative tract maps. Some owners argued that obtaining planning commission approval prior to the effective date of the RCL gave them a vested right to proceed with the conversion without the need for removal permits. (E.g., *Hazon-Iny Development, Inc. v. Unkefer* (1980) 116 Cal.App.3d Supp. 1, 3–4 [172 Cal.Rptr. 191].) In June 1979, the city council adopted an ordinance setting forth the circumstances in which it would be presumed that a property owner had a vested right to convert a building. (*Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858, 863 [201 Cal.Rptr. 593, 679 P.2d 27].) When certain owners' application for a vested rights exemption was denied, they litigated the issue up to the California Supreme Court, arguing, among other things, that the state Subdivision Map Act preempted the City's attempt to regulate condominium conversions in the RCL. In April 1984, the Supreme Court rejected this argument, and upheld the RCL. (*Id.* at pp. 868–869.) In the course of its opinion, however, the Supreme Court noted that obtaining subdivision map approval *does* grant the owner the right to subdivide the building, "that is, to sell fee interests in single apartment units." (*Id.* at p. 865.) The court held, however, that the owner could not transfer those interests free of the general requirement that the owner of a controlled rental unit must obtain a permit before removing it from the rental market. (*Id.* at pp. 865–866.)

Building owners interpreted this language to create a loophole in the law (the *Santa Monica Pines* loophole). *Santa Monica Pines* held that fee interests in single apartment units could be sold, based on subdivision map approval alone. But since the RCL provided for owner-occupancy evictions, each new owner of an individual unit could then evict the tenant in the unit, thereby effectively removing the entire building from the controlled housing supply without obtaining removal permits or establishing a vested right.

The Santa Monica City Council reacted to this interpretation with Ordinance No. 1318 (CCS), which added section 4812 to the Santa Monica Municipal Code, prohibiting owner-occupancy evictions in condominiums converted without removal permits.[6] The ordinance expressly stated that its intention was to close the *Santa Monica Pines* loophole by prohibiting

---

[6] The section was subsequently renumbered to Santa Monica Municipal Code section 4.32.120.

owner-occupancy evictions in "unlawfully" converted condominiums.[7] This ordinance was adopted on October 23, 1984. Although the ordinance was adopted a few months after TORCA, it was clearly not intended to impact TORCA conversions at all.[8] Indeed, the "whereas" sections of the ordinance

---

[7] The ordinance reads:

"WHEREAS, in the interest of the public health, safety, and welfare, the Rent Control Charter Amendment . . . regulates evictions from residential rental units; and

"WHEREAS, it is the intent and purpose of the Rent Control Charter Amendment to protect the rental housing stock and prevent evictions by regulating the removal of controlled rental units through conversion, demolition, or other means; and

"WHEREAS, to protect the rental housing stock the Rent Control Charter Amendment requires a removal permit be issued prior to any such removal; and

"WHEREAS, it has been the understanding of the City of Santa Monica and the Santa Monica Rent Control Board that a removal permit is required in all cases of condominium conversion, including those cases where the landlord has secured and filed a final subdivision map; and

"WHEREAS, the California Supreme Court has affirmed the validity and necessity of the removal permit requirement in the case of [*Santa Monica Pines*]; and

"WHEREAS, several landlords and developers in the City have construed [*Santa Monica Pines*] to allow sale of individual condominium units wherever the owner has secured and filed a final subdivision map, irrespective of whether a removal permit has been obtained; and

"WHEREAS, section 1806 of the Rent Control Law limits the grounds for eviction but does not prohibit evictions for the purpose of owner and owner-relative occupancy; and

"WHEREAS, by Regulation, the Rent Control Board has permitted one eviction per property by persons owning not less than 50% of the entire property for the purpose of owner or owner-relative occupancy; and

"WHEREAS, developer[s] and landlords have contended that existing law allows the sale of converted apartment units without a removal permit, and thereafter allows the new owners thereof to evict tenants pursuant to [the provisions governing owner-occupancy evictions]; and

"WHEREAS, this construction is contrary to the intent and purpose of the Rent Control Charter Amendment and is inimical to the public he[al]th, safety, and welfare; and

"WHEREAS, buyers of unlawfully removed condominium units may be unaware that they will not be able to evict the present tenant in order to take personal occupancy; and

"WHEREAS, unlawful conversions and evictions may occur which cause irreparable harm to renters and irreversibly deplete the supply of rental housing in the City of Santa Monica; and

"WHEREAS, it is proper for the City Council to adopt curative regulations limiting evictions for owner-occupancy as originally intended by the voters and the Board,

"NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES ORDAIN AS FOLLOWS:

"SECTION 1. Section 4812 is hereby added to the Santa Monica Municipal Code to read as follows:

"Section 4812. *Tenant Evictions for Owner Occupancy.* In addition to any other protections provided in the Municipal Code, the City Charter, or the laws of the State of California, no eviction for purposes of conversion or sale incident to conversion or for personal occupancy by the landlord or owner or relative of the landlord or owner shall be allowed in any condominium or stock cooperative unit unless the unit had first been created or converted from an apartment or other rental unit on or before April 10, 1979, or the Rent Control Board has issued a removal permit or declared a vested right for said unit." (Italics added.)

[8] Nor would it. TORCA provided that inconsistent provisions of the municipal code would *not apply to the extent of the inconsistency.* (§ 2007.)

are written as though TORCA did not exist. Specifically, the ordinance states, "WHEREAS, it has been the understanding of the City of Santa Monica and the Santa Monica Rent Control Board that a removal permit is required in all cases of condominium conversion, including those cases where the landlord has secured and filed a final subdivision map . . . ." While this is true with respect to the language of the RCL itself, a removal permit is *not* required in cases of condominium conversion under TORCA. The language of Santa Monica Municipal Code section 4812 was enacted only to address the *Santa Monica Pines* loophole. Clearly, it was not intended to address any perceived deficiency in TORCA.

Although TORCA had been adopted in June 1984, the voters were not given an opportunity to enact conforming changes in the RCL until November 1984. Section 1803, subdivision (t) was the section of the RCL which required a landlord to obtain a removal permit prior to removing a unit from the rental housing market by conversion. TORCA had already provided that this section was not applicable to TORCA conversions. (§ 2007.) In November 1984, section 1813 was added to the RCL, providing, "Section 1803(t) of this Article shall not apply to any building for which approval has been received pursuant to [TORCA]. All other provisions of this Article, however, shall continue to apply with full force and effect to each unit in any building receiving approval pursuant to [TORCA]. [¶] Tenants residing in such units, whether or not 'qualifying,' 'participating,' or any other such designation under [TORCA], shall enjoy all the rights and remedies provided by [the RCL] without limitation as to duration or to ownership of the unit. This Section is declarative of existing law and does not impose any new requirements or limit any existing ones."

At the same time, two other changes were made to the RCL, for the purpose of permanently closing the *Santa Monica Pines* loophole. First, section 1806, subdivision (h), allowing owner-occupancy evictions, was amended to incorporate the language of former Santa Monica Municipal Code section 4812, preventing owner-occupancy evictions in condominiums converted after the effective date of the RCL "unless the Rent Control Board has issued a removal permit or declared a vested right for said unit." (§ 1806, former subd. (h)(6), now subd. (a)(8)(vi).) Second, a new subsection was added to section 1803, subdivision (t), governing removal permits. That subsection provides, "The Housing Element of the General Plan of the City of Santa Monica shall at all times contain a provision that neither the City Council nor any City agency shall approve an application for tentative subdivision map or tentative parcel map for a converted unit until and unless the applicant first obtains a removal permit as required by this Section. This subsection shall not apply to any tentative subdivision map or tentative parcel map approved in accordance with [TORCA]." (§ 1803, subd. (t)(3).)

What is clear from this history is that the voters did *not* adopt the language now codified at section 1806, subdivision (a)(8)(vi) as a response to TORCA, in order to strengthen protections for nonparticipating tenants. Instead, the voters were simply adding to the RCL the language of a municipal code section which had been enacted to close the *Santa Monica Pines* loophole.[9]

This conclusion is supported by the fact that, *at the same time* the voters adopted the language which was to become section 1806, subdivision (a)(8)(vi), they also adopted the language of section 1813 which made all sections of the RCL, except the removal permit requirement, applicable to TORCA units. Section 1813 specifically indicated it was declarative of existing law and was not adding any additional requirements. It is therefore unlikely the voters intended the simultaneously enacted section 1806, subdivision (a)(8)(vi) requirement to impose an additional burden on TORCA conversions.

■ This legislative history supports our interpretation of the relevant Charter language. TORCA's exemption from the removal permit requirement likewise exempts TORCA conversions from section 1806, subdivision (a)(8)(vi)'s prohibition on owner-occupancy evictions in units converted without removal permits.

### 3. *Invalidity of Regulation Precluding Owner-occupancy Eviction Four Years After Dismissal of Owner-occupancy Eviction Attempt*

■ Section 1803, subdivision (g) of the RCL grants the Board the authority to promulgate rules and regulations "as will further the purposes of the Article." In 1993, the Board promulgated regulation 9002, subdivision (b), which is specifically intended to govern evictions for owner-occupancy. Subdivision (b)(3) of regulation 9002 (this subdivision shall be referred to as the Regulation) provides, "Any owner who files suit against a tenant for eviction for owner or relative occupancy and who subsequently has the action dismissed, either voluntarily or involuntarily, is precluded from terminating that tenant's tenancy for owner or relative occupancy for four years from the date of dismissal, unless such dismissal is pursuant to a written settlement agreement between the owner and tenant negotiated at arms length and signed by both parties."

---

[9] The Board relies on a staff report by the city attorney to the mayor and city council setting forth the rationale for the amendments to be submitted to the voters in November 1984. Taking certain phrases out of context, the Board argues the language now codified at section 1806, subdivision (a)(8)(vi) was intended to "prohibit evictions in converted condominium units." (Santa Monica City Attorney, June 10, 1984 Staff Report, p. 2 (Staff Report).) Obviously this statement should not be taken at face value; the amendment itself excepted conversions for which removal permits had been obtained. What is clear from the staff report, and wholly overlooked by the Board, is that the language currently found at section 1806, subdivision (a)(8)(vi) was expressly intended to close the *Santa Monica Pines* loophole. (Staff Report, *supra*, at p. 20.)

██ A rent control provision enacted by a city cannot be given effect "to the extent that it conflicts with general laws either directly or by entering a field which general laws are intended to occupy to the exclusion of municipal regulation." (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 141 [130 Cal.Rptr. 465, 550 P.2d 1001].) In *Birkenfeld*, our Supreme Court found no preemption of a rent control law that created additional *substantive defenses* to eviction, but struck down that part of the law which imposed additional *procedural requirements* on landlords attempting eviction. (*Id.* at pp. 149–151.) "Unlike the limitations imposed by the [rent control law] upon chargeable rents and upon the grounds for eviction, which can affect summary repossession proceedings only by making substantive defenses available to the tenant, the [mandated pre-eviction procedures] raise[] procedural barriers between the landlord and the judicial proceeding." (*Id.* at p. 151.) Similarly, in *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 693–698 [209 Cal.Rptr. 682, 693 P.2d 261], the Supreme Court struck down that portion of a rent control law which not only provided that retaliation would be a defense to an eviction, but also provided that any eviction within six months of a tenant's exercise of rent control rights would be *presumed* to be retaliatory. The provision directly conflicted with the Evidence Code's allocation of the burden of proof (Evid. Code, § 500) and was therefore invalid.

In this case, Bohbot contends the Regulation creates an impermissible *conclusive presumption* that a second owner-occupancy eviction attempted within four years of dismissal of an earlier eviction is brought in bad faith. The Board contends the Regulation is permissible as it creates only a *substantive defense* to eviction, not an improper *procedural requirement*.[10]

██ We find Bohbot's argument persuasive. To the extent the regulation creates a so-called substantive defense, the "defense" it creates is based on the fact that the landlord voluntarily dismissed without prejudice a previous attempt to evict for owner-occupancy. The procedures governing unlawful detainer actions specify that, unless otherwise indicated, the general provisions of the Code of Civil Procedure apply to unlawful detainer actions. (Code Civ. Proc., § 1177.) These provisions include Code of Civil Procedure section 581, which permits plaintiffs to obtain voluntary dismissals without prejudice if sought prior to the commencement of trial. (Code Civ. Proc., § 581, subd. (b)(1).) ██ In other words, the Regulation conflicts with the provisions of the Code of Civil Procedure which allow for the voluntary dismissal without prejudice of an unlawful detainer action. Calling this a

---

[10] The Board represents that the Regulation was adopted in order to "address abuses by landlords who file successive attempts to evict the same tenant for owner-occupancy. Prior to its adoption, tenants under these circumstances were forced to repeatedly defend against eviction in cases where the landlord would withdraw the suit prior to judgment if he/she believed the tenant might prevail. In response, [the Regulation] was adopted as a substantive defense to harassment by continual litigation."

substantive defense does not change the fact that the Regulation eliminates a procedural right granted to plaintiffs in unlawful detainer (and all other civil) actions. The Regulation cannot stand.[11]

## *DISPOSITION*

The judgment is reversed. The case is remanded for entry of declaratory relief in favor of plaintiff Bohbot. Bohbot is to recover his costs on appeal.

Kitching, J., and Aldrich, J., concurred.

---

[11] We note that invalidation of the Regulation does not leave tenants without remedy for abuse of the unlawful detainer process. RCL section 1806, subdivision (a)(8) permits only those owner-occupancy evictions brought in "good faith." Santa Monica Municipal Code section 4.56.020 prohibits acts of tenant harassment, including malicious unlawful detainer actions.