[Nos. D057437, D058835. Fourth Dist., Div. One. May 25, 2012.]

SAN DIEGO CITY FIREFIGHTERS, LOCAL 145, IAFF, AFL-CIO et al.,
Plaintiffs and Appellants, v.
BOARD OF ADMINISTRATION OF SAN DIEGO CITY EMPLOYEES'
RETIREMENT SYSTEM et al., Defendants and Respondents.

596

## COUNSEL

Glaser, Weil, Fink, Jacobs, Howard & Shapiro, Joel N. Klevens and Lisa M. Zepeda for Plaintiffs and Appellants.

Kirby Noonan Lance & Hoge, David J. Noonan and Steven W. Sanchez for Defendant and Respondent Board of Administration of the San Diego City Employees' Retirement System.

Jan I. Goldsmith, City Attorney, and Walter C. Chung, Deputy City Attorney, for Defendant and Respondent City of San Diego and its City Council.

## OPINION

**BENKE, Acting P. J.**—This lawsuit involves two facets of the San Diego City Employees' Retirement System (the SDCERS) that defendant and respondent City of San Diego (City)[1] retroactively repealed after the Internal Revenue Service (IRS) issued a compliance statement under its Voluntary Correction Program identifying certain aspects of the SDCERS as noncompliant with section 401(a) of the Internal Revenue Code (26 U.S.C. § 401(a)), which sets forth requirements for qualified retirement plans.[2]

Plaintiff and appellant San Diego City Firefighters, Local 145, IAFF, AFL-CIO (Local 145), a union, and individual plaintiffs and appellants

---

[1] The petition/complaint named "City of San Diego and its City Council" in the caption, but the substance of the petition/complaint refers to those entities collectively as a single entity designated as "City." Accordingly, we do not separately refer to the City Council when describing the entities sued in the petition/complaint.

[2] In general, status as a qualified retirement plan results in numerous tax advantages: "An employer may deduct from its gross income the amount which it contributes to a qualified employee retirement plan, so long as that amount is within statutory limits. . . . Employees who participate in qualified plans are not taxed on the amounts that their employers contribute to the plans, on the plans' earnings, or on some of their own contributions to the plan until they actually receive distributions from the plan. . . . Earnings on the funds held by the plans are exempt from taxation." (14A Mertens, The Law of Federal Income Taxation (2008) § 54:68, fns. omitted.) Conversely, "[d]isqualification of a benefit plan will result in the nondeductibility of employer contributions, inclusion of employer contributions in employee income, and taxation of income earned by the trust." (*Ibid.*)

Michael Ditomaso, Leslie Gallo, Adolfo Gonzales, Timothy Harris, Glen Mackie, Jon McDonald, Matthew Praizner, Don Rock and Steve Willcuts (Firefighter Plaintiffs), a group of City firefighters and Local 145 members impacted by City's repeal of the SDCERS program that allowed them to convert their annual leave to service credit for the purpose of calculating retirement benefits, asserted claims against City and defendant and respondent the Board of Administration of the San Diego City Employees' Retirement System (the SDCERS Board), including for breach of contract, unconstitutional impairment of contract and declaratory relief. They also sought a writ of mandate compelling City and the SDCERS Board to reinstate their benefits under the repealed program.

Plaintiff and appellant Ronald Saathoff is a retired City fire captain who, until 2008, served as president of Local 145. Saathoff also was impacted by City's repeal of the SDCERS program that calculated retirement benefits of incumbent presidents of municipal employee unions (including Local 145) based on a combination of their salary from the City and their salary from serving as union president. Saathoff and Local 145 asserted claims against City arising from the repeal of that program, including for breach of contract, unconstitutional impairment of contract and declaratory relief, and sought a writ of mandate compelling City and the SDCERS Board to reinstate the program and Saathoff's benefits under it.

Saathoff, Local 145 and Firefighter Plaintiffs (together, appellants) contend that the trial court erred in sustaining without leave to amend the demurrers of City and the SDCERS Board. As we will explain, we disagree and conclude the trial court properly sustained the demurrers without leave to amend. Judgment affirmed.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

"San Diego is a charter city. It maintains a pension plan for its employees, the [SDCERS]. (San Diego City Charter, art. IX, § 141; San Diego Mun. Code, § 24.0101.) SDCERS is a defined benefit plan in which benefits are based upon salary, length of service, and age. (San Diego Mun. Code, §§ 24.0402–24.0405.) The plan is funded by contributions from both the City and its employees. (San Diego City Charter, art. IX, § 143; San Diego Mun. Code, § 24.0402.) Membership is compulsory. (San Diego Mun. Code, § 24.0104, subd. (a).)" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1063

---

[3] City has submitted a request that we take judicial notice of a May 20, 2005 resolution of the SDCERS Board. We reject the request as the document at issue is not necessary to our resolution of this appeal. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [76 Cal.Rptr.2d 749, 958 P.2d 1062] [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)

[103 Cal.Rptr.3d 767, 222 P.3d 214].) As noted *ante*, this lawsuit concerns two aspects of the SDCERS that City repealed by ordinance, which we will detail below.

A. *Incumbent President Program*

On October 21, 2002, the City Council adopted resolution No. R-297212. It provided that the retirement benefit formula for each of the incumbent presidents of three unions that represent municipal employees would be based on each of those individuals' highest one-year combined salaries from their City employment *and* their union employment, not to exceed the annual base salary of City's labor relations manager (the Incumbent President Program). At the time, Saathoff was the incumbent president of one of those unions, namely, Local 145.

Consistent with resolution No. R-297212, in October 2003, City entered into a written agreement with Saathoff stating that effective July 1, 2001, Saathoff's salary for purposes of calculating his retirement benefits would be based on his combined City and Local 145 salary, not to exceed the annual base salary of the City labor relations manager, and providing for employer and employee contributions to the SDCERS to be based on that salary amount (the Saathoff Agreement). According to Saathoff, he made lump-sum and biweekly contributions to the SDCERS based on the Saathoff Agreement.

In December 2007, the IRS issued a compliance statement (the IRS Compliance Statement) pursuant to its Voluntary Correction Program,[4] which identified several aspects of the SDCERS that did not comply with Internal Revenue Code section 401(a).[5] The IRS Compliance Statement identified the Incumbent President Program, among others, as a noncomplying aspect of the SDCERS.

---

[4] The IRS Web site explains the Voluntary Correction Program as follows: "A Plan Sponsor that maintains a plan that experiences one or more Qualification Failures may seek to preserve the tax benefits of its retirement plan. If the plan sponsor discovers the problems prior to the plan (or the plan sponsor, if the plan sponsor is a tax-exempt organization) coming under Examination, it may bring such failures to the attention of the IRS through the Voluntary Correction Program . . . . In such cases, the plan sponsor pays a fee to preserve the tax benefit associated with properly maintained retirement plans, but in virtually all cases, the fee, which is based on the size of the plan, is equal to only a small fraction of the amount of tax benefit preserved." (See Rev. Proc. 2008-50, 2008-35 I.R.B. 464 [explaining Voluntary Correction Program].)

[5] As alleged in the operative pleading, "[i]n or about July 2005, the SDCERS entered into IRS's Voluntary Correction Program." The IRS Compliance Statement explains that the SDCERS Board "submitted a request to the [IRS] under the Voluntary Correction Program for a compliance statement relating to various qualification failures under section 401(a) of the Internal Revenue Code . . . that they . . . identified."

Specifically, the IRS Compliance Statement stated: "[T]he terms of the [SDCERS] provided special retirement benefits to past and current union presidents . . . that were not permitted by the [Internal Revenue] Code. Under [Internal Revenue Code] section 401(a), retirement benefits in a qualified plan can only be provided to employees of an employer and such benefits are generally based solely on service with and compensation paid by such employer. Specifically, the following problems were noted: [¶] . . . [¶] (c) Starting in 2002, the Incumbent President Program allowed compensation that was paid to the union presidents by the Unions to be counted in the determination of retirement benefits under the [SDCERS], and such amounts would be combined with any other compensation paid by the [City] subject to a specified dollar cap."

The IRS Compliance Statement also described the corrective action to be taken regarding the Incumbent President Program, including that "[City] will amend the [SDCERS] *retroactively* to remove any provisions relating to . . . the Incumbent President Program" (italics added) and "[t]he resulting changes to the [SDCERS] will indicate that . . . retirement benefits would be based solely on paid compensation and service associated with [City] or other participating employers."

Under the terms of the IRS Compliance Statement, the IRS would not pursue the sanction of disqualification of the SDCERS based on the qualification failures described therein, conditioned on "the completion of all corrections described" within 150 days.

By affixing their representatives' signatures to the IRS Compliance Statement, both City and the SDCERS Board indicated their agreement to its terms on December 20, 2007.

In April 2008, the City Council passed ordinance No. O-19740 to implement the corrections outlined in the IRS Compliance Statement. Among other things, ordinance No. O-19740 retroactively terminated the Incumbent President Program and provided that a union president's base compensation for purposes of retirement benefits "will not include any amounts paid by the labor organization."

B. *Annual Leave Conversion Program*

A July 2002 memorandum of understanding between Local 145 and City (the 2002 MOU) specified certain changes to the SDCERS, including that employees in the bargaining unit (i.e., the City firefighters represented by Local 145) "will be allowed to convert annual leave cash equivalent to retirement service credit on a pre-tax basis." The 2002 MOU also provided

that "[e]mployees in the bargaining unit will no longer be eligible to exercise any cash out feature of annual leave accrued from July 1, 2002 prospectively" (the Annual Leave Conversion Program).

The Annual Leave Conversion Program was codified in former section 24.1310, subdivision (c) of the San Diego Municipal Code by ordinance No. O-19126 adopted by the City Council in December 2002.[6]

Ordinance No. O-19126 stated that "[a]ny aspect of this ordinance affecting the retirement benefits shall take effect upon approval by the Membership of the Retirement System pursuant to [City] Charter section 143.1 . . . ." The City Charter, in turn, provided that "[n]o ordinance amending the retirement system which affects the benefits of any employee under such retirement system shall be adopted without the approval of a majority vote of the members of said system." (San Diego City Charter, former art. IX, § 143.1.) In December 2002, a vote of the SDCERS members was held to approve the Annual Leave Conversion Program and other changes to the SDCERS. Out of a total of 10,311 persons eligible to vote, 2,228 persons responded, with 2,193 persons voting in favor of the changes and 35 persons voting against them.

The Annual Leave Conversion Program was put into effect, and Firefighter Plaintiffs each participated in the program. Specifically, Firefighter Plaintiffs each completed and signed a form indicating that he or she wished to convert his or her eligible annual leave hours as payment for the purchase of retirement service credit.[7]

The IRS Compliance Statement identified the Annual Leave Conversion Program as noncompliant with section 401(a) of the Internal Revenue Code. As described in the IRS Compliance Statement, "[s]tarting in the plan year

---

[6] Specifically, ordinance No. O-19126 amended the City's municipal code to state that bargaining unit members who had not yet entered the SDCERS Deferred Retirement Option Plan "may convert the cash equivalent of their Unused Annual Leave accrued after July 1, 2002, to Creditable Service in the Retirement System on a pre-tax basis." (San Diego Mun. Code, former § 24.1310(c).)

[7] As reflected by the documents attached to the operative pleadings, most of the Firefighter Plaintiffs completed a form titled "Annual Leave/SDCERS—Eligible for Conversion to PSC," on which they filled out their name, Social Security number, information about their rate of pay and eligible leave balance and signed below the statement, "I wish to convert eligible annual leave hours as payment for the purchase of service credits." The form was then signed by an SDCERS retirement analyst next to the words, "Approved by SDCERS." For some of the Firefighter Plaintiffs, the record contains forms that were not designed for the Annual Leave Conversion Program but instead were designed for the purchase of retirement service credits by other methods, such as cash payment or rollover of 401(k) accounts. Those forms were modified by interlineations to indicate that the retirement service credits would be purchased by the conversion of an annual leave balance.

that ended in 2003, the terms of the [SDCERS] were amended to provide for an impermissible cash or deferred arrangement in violation of [Internal Revenue Code] section 401(a) in regard to the [Annual Leave Conversion Program][8] that was offered to participants who were members of [Local 145] bargaining unit." As corrective action, the IRS Compliance Statement specified: "The [City] will amend the [SDCERS] *retroactively* to remove any provisions relating to the [Annual Leave Conversion Program]. [¶] . . . [¶] This change will remove the impermissible cash or deferred arrangement from the [SDCERS]." (Italics added.)

Ordinance No. O-19740 implemented the retroactive removal of the Annual Leave Conversion Program by repealing effective July 1, 2002, section 24.1310, subdivision (c) of the San Diego Municipal Code.

According to appellants, after terminating the Annual Leave Conversion Program, City informed members of Local 145 that it would restore members' annual leave and would pay retired members a lump sum equivalent to any annual leave they had converted to retirement service credit.

### C. *Lawsuit Against City and the SDCERS Board*

Within a year after ordinance No. O-19740 repealed the Incumbent President Program and the Annual Leave Conversion Program, appellants filed written claims with City pursuant to Government Code section 945.4 seeking compensation and specific performance from City. City did not respond to the claims, and thus they were deemed to have been denied by City. (Gov. Code, § 912.4, subd. (c).)

Appellants then commenced this litigation by filing, in a single pleading, a verified petition for writ of mandate and a complaint against City and the SDCERS Board.

Firefighter Plaintiffs and Local 145 sought a writ of mandate against City and the SDCERS Board seeking to rescind the repeal of the Annual Leave Conversion Program and to reinstate the corresponding retirement service credit (second cause of action). Firefighter Plaintiffs and Local 145 also asserted claims arising from the repeal of the Annual Leave Conversion Program for (1) breach of contract against City (eighth cause of action); (2) unconstitutional impairment of contract against City and the SDCERS Board (fourth cause of action); (3) violation of public policy against City (sixth cause of action); (4) declaratory relief against City and the SDCERS Board

---

[8] The IRS Compliance Statement referred to the Annual Leave Conversion Program as "the Cashless Leave Conversion Program."

(fourteenth cause of action); and (5) promissory estoppel against City (sixteenth cause of action). Firefighter Plaintiffs (without Local 145) asserted a claim for breach of contract against the SDCERS Board (ninth cause of action). Ditomaso (without the other Firefighter Plaintiffs) asserted a claim for breach of fiduciary duty against the SDCERS Board (twelfth cause of action).

Based on the repeal of the Incumbent President Program, Saathoff and Local 145 sought a writ of mandate against City and the SDCERS Board (first cause of action). They also asserted claims for (1) breach of contract against City (seventh cause of action); (2) unconstitutional impairment of contract against City (third cause of action); (3) violation of public policy against City (fifth cause of action); (4) declaratory relief against City and the SDCERS Board (thirteenth cause of action); and (5) promissory estoppel against City (fifteenth cause of action).[9]

Arising out of the repeal of both the Incumbent President Program and the Annual Leave Conversion Program, appellants asserted a single negligence claim against City (tenth cause of action).

The trial court sustained demurrers filed by City and the SDCERS Board to each of the causes of action in the petition/complaint. The trial court also denied leave to amend the petition/complaint and it entered judgment and orders of dismissal in favor of City and the SDCERS Board.

## DISCUSSION

### I

### *Standard of Review*

" 'On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.' " (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 650 [43 Cal.Rptr.3d 434].) "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192].) In reviewing the petition/complaint, "we must assume

---

[9] The petition/complaint also asserted a claim for breach of fiduciary duty by Saathoff against the SDCERS Board (eleventh cause of action), but Saathoff voluntarily dismissed with prejudice that cause of action.

the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814 [107 Cal.Rptr.2d 369, 23 P.3d 601].)

Further, "[i]f the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. (*Ibid.*) The plaintiff has the burden of proving that an amendment would cure the defect. (*Ibid.*)" (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) "[S]uch a showing can be made for the first time to the reviewing court [citation] . . . ." (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 711 [113 Cal.Rptr.2d 399].)

II

*Saathoff and Local 145's Claims Against City Arising from the Repeal of the Incumbent President Program*

We first examine the claims against City based on the repeal of the Incumbent President Program.

A. *Claims Based on the Existence of a Valid Contract*

Except for claims for negligence and promissory estoppel, each of the causes of action against City by Saathoff and Local 145 depend on the existence of a valid contract establishing Saathoff's right to the benefits provided by the Incumbent President Program. Specifically, the existence of a valid contract is necessary for Saathoff and Local 145 to prevail on their claims of breach of contract (seventh cause of action), unconstitutional impairment of contract (third cause of action)[10] and violation of public policy (fifth cause of action).[11] Further, because the cause of action for writ of mandate (first cause of action) seeks an order enforcing City's alleged

---

[10] "When a claim is presented under the contract clause [(U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. 1, § 9)], it must first be determined 'whether there is a valid contract to be impaired.' " (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 871 [5 Cal.Rptr.3d 634] (*Medina*).) "The contract clause does not protect expectations that are based upon contracts that are invalid, illegal, unenforceable, or which arise without the giving of consideration." (*Walsh v. Board of Administration* (1992) 4 Cal.App.4th 682, 696 [6 Cal.Rptr.2d 118].)

[11] As set forth in the petition/complaint, the cause of action for violation of public policy is based on City's alleged unconstitutional impairment of contract, and thus—like that cause of action—depends on the existence of a valid contract.

obligation to provide Saathoff with benefits under the Incumbent President Program, and because the cause of action for declaratory relief (fifteenth cause of action) seeks a declaration establishing that same obligation, those causes of action also fail if no valid contract exists establishing City's obligation.

Saathoff and Local 145 identify two possible bases for City's contractual obligation: resolution No. R-297212 and the Saathoff Agreement. We consider each in turn.

### 1. *Resolution No. R-297212*

As we have explained, by adopting resolution No. R-297212, City purported to create the Incumbent President Program as part of the SDCERS. Under established law, a public agency's pension plan may give rise to a contractual obligation on the part of the public agency. (See *Miller v. State of California* (1977) 18 Cal.3d 808, 814 [135 Cal.Rptr. 386, 557 P.2d 970] ["Pension rights . . . are deferred compensation earned immediately upon the performance of services for a public employer '[and] cannot be destroyed . . . without impairing a contractual obligation. Thus the courts of this state . . . have uniformly held that pension laws . . . establish contractual rights.' "]; see also *Betts v. Board of Administration* (1978) 21 Cal.3d 859, 864 [148 Cal.Rptr. 158, 582 P.2d 614] (*Betts*); *Allen v. City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765].) City argues, however, that the Incumbent President Program did not become part of the SDCERS and thus cannot give rise to a contractual obligation. We agree.[12]

As City points out, the City Charter sets forth a specific method for creating benefits under the SDCERS, which was not followed when the Incumbent President Program was adopted. The City Charter states that "[t]he Council of the City is . . . authorized . . . *by ordinance* to establish a retirement system . . . ." (San Diego City Charter, art. IX, § 141, italics added.) There is a substantial difference between a resolution and an ordinance: " '[A] resolution . . .is ordinarily not equivalent to an ordinance. A resolution is usually a mere declaration with respect to future purpose or proceedings . . . . An ordinance is a local law which is adopted with all the legal formality of a statute.' [Citations.] A resolution adopted without the 'formality' required of an ordinance cannot be deemed an ordinance." (*City of Sausalito v. County of Marin* (1970) 12 Cal.App.3d 550, 565–566 [90 Cal.Rptr. 843].) " ' " 'Resolution' denotes something less formal. It is the mere expression of the opinion of the legislative body concerning some

---

[12] We need not, and do not, consider whether, if validly adopted as part of the SDCERS, the Incumbent President Program would have constituted a contractual obligation of City.

administrative matter for the disposition of which it provides. Ordinarily it is of a temporary character, while an ordinance prescribes a permanent rule of conduct or of government." ' [Citation.]" (*County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965, 979 [84 Cal.Rptr.2d 179].)

■ Consistent with the distinction between ordinances and resolutions, the version of the City Charter when resolution No. R-297212 was adopted in 2002 set forth several formal requirements for ordinances, but not for resolutions, including that (1) with certain exceptions, ordinances shall be passed only after 12 calendar days have elapsed between the day of their introduction and the day of their final passage; (2) each ordinance shall be read in full prior to the final passage of such ordinance, unless the requirements for dispensing with such a reading have been satisfied; (3) the yeas and nays shall be taken upon the passage of all ordinances and entered upon the journal of the proceedings of the City Council; and (4) apart from certain exceptions (e.g., validly declared emergency measures), ordinances take effect not less than 30 days from the date of their passage. (San Diego City Charter, former art. III, §§ 16, 17.)

■ In addition to the requirement that the provisions of the SDCERS be established by ordinance, the City's charter also requires a vote of the SDCERS members to approve an amendment to the SDCERS. (San Diego City Charter, former art. IX, § 143.1.) It is undisputed that no such vote occurred with respect to the Incumbent President Program.

■ In the case of a charter city, "the charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law. [Citation.] . . . '[T]he charter operates . . . as an instrument of *limitation and restriction* on the exercise of power over all municipal affairs which the city is assumed to possess . . . . [Citations.]' [Citations.]" (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 [36 Cal.Rptr.2d 521, 885 P.2d 934] (*Domar*), italics added.) "[I]t is well settled that a charter city may not act in conflict with its charter. [Citations.] Any act that is violative of or not in compliance with the charter is void. [Citation.]" (*Id.* at p. 171.) The provisions of the city's charter thus "supersede all municipal laws, ordinances, rules or regulations inconsistent therewith" (*Stuart v. Civil Service Com.* (1985) 174 Cal.App.3d 201, 206 [219 Cal.Rptr. 770]) and "an ordinance [(or resolution)] violative of or not in compliance with the city charter is void." (5 McQuillin, The Law of Municipal Corporations (3d ed.) § 15:17, p. 144.)

■ Here, City's adoption of the Incumbent President Program by resolution is void because it conflicts with the City Charter requirements that the SDCERS provisions be adopted by ordinance and that the SDCERS members

vote to approve the provisions. Therefore, resolution No. R-297212 is void to the extent it purported to adopt the Incumbent President Program, and it cannot form the basis for a contractual obligation on the part of City to provide benefits to Saathoff under that program.

### 2. *The Saathoff Agreement*

■ For similar reasons, the Saathoff Agreement is ineffective to create a contractual obligation on the part of City to provide benefits under the Incumbent President Program. "[A] contract entered into by a governmental entity without the requisite constitutional or statutory authority is void and unenforceable." (*Air Quality Products, Inc. v. State of California* (1979) 96 Cal.App.3d 340, 349 [157 Cal.Rptr. 791].) Because resolution No. R-297212 purporting to create the Incumbent President Program was void, City had no authority to enter into the Saathoff Agreement to implement the provisions of the Incumbent President Program. Further, treating the Saathoff Agreement as creating retirement benefits would impermissibly conflict with the City Charter because, as we have explained, the City Charter requires that any such benefits be established through ordinance and be approved in a vote of the SDCERS membership.

### 3. *The Incumbent President Program Is Not Enforceable as a Binding Memorandum of Understanding Created Under the Meyers-Milias-Brown Act*

Saathoff and Local 145 also argue that the Incumbent President Program is a valid contract because it is the subject of an agreement between City and Local 145 that should be treated as a memorandum of understanding as described in the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) (MMBA).

■ The MMBA governs labor relations between local public agencies and local public employee organizations. (Gov. Code, § 3500.) Under the MMBA, designated representatives of a public agency may meet and confer with public employee organizations concerning the terms and conditions of employment (Gov. Code, § 3505), and "[i]f agreement is reached . . . , they shall jointly prepare a written memorandum of such understanding, which shall not be binding, and present it to the governing body or its statutory representative for determination" (*id.*, § 3505.1). As our Supreme Court has explained, "once the governmental body votes to accept the memorandum, it becomes a binding agreement." (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 335 [124 Cal.Rptr. 513, 540 P.2d 609] (*Glendale*).)

Saathoff and Local 145 point to a recital in resolution No. R-297212 that "the City . . . met and conferred with . . . the . . . unions" and "agreed to base

the retirement benefit formula for those incumbent union presidents on their respective high one-year salary from their combined City and union salary, not to exceed the annual base salary of the City's Labor Relations Manager." Based on this language, Saathoff and Local 145 assert that the MMBA applies because "the parties negotiated and reached an agreement with respect to the [Incumbent President Program], reduced that agreement to writing, and presented their formalized agreement to the City Council for approval, which the City Council then approved."

Saathoff and Local 145 have not identified any written memorandum of understanding between City and Local 145. Resolution No. R-297212 is an action taken by the City Council alone. It is not a "jointly prepare[ed] . . . written memorandum of . . . understanding" as required by the MMBA. (Gov. Code, § 3505.1.) Therefore, we conclude that the MMBA does not apply here.

Further, even if a jointly prepared memorandum of understanding existed that satisfied the MMBA, that agreement could not be given effect because doing so would conflict with the City Charter requirement that amendments to the SDCERS be adopted by ordinance and be approved by a vote of the SDCERS members. (*Domar, supra,* 9 Cal.4th at p. 171 ["Any act that is violative of or not in compliance with the charter is void."].)

### B. *Promissory Estoppel Claim*

Although not dependent on the existence of an enforceable contract,[13] the promissory estoppel claim of Saathoff and Local 145 against City (fifteenth cause of action) fails because of the provisions of the City Charter that we have discussed above.

■ "[N]either the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public." (*County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 826 [186 P.2d 124]; see *Medina, supra,* 112 Cal.App.4th at p. 869; *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423].) Based on this principle, courts have "consistently reject[ed the] proposition" that "even if the requirements of the charter for contract formation have not been satisfied, [a charter city] can be estopped to deny the formation of a contract." (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 667–668 [76 Cal.Rptr.2d 626].) "When there has been no compliance with

---

[13] "Promissory estoppel is an equitable doctrine to allow enforcement of a promise that would otherwise be unenforceable . . . ." (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 902 [28 Cal.Rptr.3d 894].)

the relevant charter provision, the city may not be liable in quasi-contract and will not be estopped to deny the validity of the contract." (*San Francisco Internat. Yachting etc. Group v. City and County of San Francisco* (1992) 9 Cal.App.4th 672, 683–684 [12 Cal.Rptr.2d 25].)

Here, as the trial court concluded, applying the principle of estoppel would operate to defeat the public policy—expressed in the City Charter—of requiring the adoption of retirement benefits by ordinance and after a vote of approval by the SDCERS members. Therefore, we conclude the trial court properly sustained without leave to amend City's demurrer to the promissory estoppel cause of action asserted by Saathoff and Local 145.

### C. *Negligence Claim*

The final cause of action by Saathoff and Local 145 against City is for negligence (tenth cause of action).

Unless a statutory exception applies, "[a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815, subd. (a).) One exception provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his [or her] employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his [or her] personal representative" (*id.*, § 815.2, subd. (a)), except "where the employee is immune from liability" (*id.*, subd. (b)). This "[v]icarious liability is a primary basis for liability on the part of a public entity, and flows from the responsibility of such an entity for the acts of its employees under the principle of respondeat superior." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128 [119 Cal.Rptr.2d 709, 45 P.3d 1171].)

The cause of action for negligence relies on the respondeat superior exception to governmental immunity and alleges that unidentified "managerial employees" of City and "City Attorneys" did not "act with due care" when "implement[ing] the pension benefit promises." It further alleges that Saathoff and Local 145 "reasonably relied on the superior expertise and knowledge of the City's managerial employees and City Attorneys in determining that the pension benefits promised by the City pursuant to the [Incumbent President Program] were lawful and in full compliance with any federal, state, or city law, rules and regulations." The negligence cause of action incorporates by reference the allegation that in 2004 a deputy city attorney confirmed, in response to an e-mail inquiry from the SDCERS's general counsel, "that he agreed that [resolution No. R-297212] constituted a sufficient authorization for the SDCERS to pay the pension benefits authorized by [resolution No. R-297212]."

However, as we have explained, the Incumbent President Program does not give rise to an enforceable obligation to pay benefits to Saathoff because it was not implemented by ordinance. Therefore, we examine whether Saathoff and Local 145 have pled, or could amend the petition/complaint to plead, that any actionable breach of the duty of care on the part of City caused those benefits to be unavailable to Saathoff.

To the extent the negligence cause of action by Saathoff and Local 145 is based on the alleged representation of the deputy city attorney that resolution No. R-297212 constituted sufficient authorization for the Incumbent President Program, City is insulated by Government Code section 818.8, which states that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

If the negligence cause of action is based on the fact that the City managerial employees or attorneys did not arrange for the Incumbent President Program to be adopted by ordinance rather than by resolution, City has immunity under Government Code section 818.2, which provides that "[a] public entity is not liable for an injury caused by adopting or failing to adopt an enactment . . . ."

Saathoff and Local 145 argue that they can cure any deficiency in the negligence cause of action by amending the petition/complaint to allege that City failed to use due care in adopting the SDCERS provisions that failed to comply with section 401(a) of the Internal Revenue Code, and that City had a duty to adopt *different* provisions that would have complied with that section. Even with such an amendment, the negligence cause of action would fail because it would be based on an attempt to impose liability on City "for an injury caused by adopting or failing to adopt an enactment," for which City also has immunity. (Gov. Code, § 818.2.)[14]

Thus, we conclude that the trial court did not error when it sustained without leave to amend the demurrer of City to the negligence claim of Saathoff and Local 145.

---

[14] As we have discussed, City is required to establish the provisions of SDCERS by adopting ordinances. Therefore, an allegation that City was negligent with respect to establishing certain provisions of SDCERS is in substance an allegation that City was negligent in enacting or failing to enact an ordinance.

## III

### *Saathoff and Local 145's Claims Against the SDCERS Board*

We next consider the claims asserted by Saathoff and Local 145 against the SDCERS Board arising from the Incumbent President Program, namely, (1) writ of mandate (first cause of action) and (2) declaratory relief (thirteenth cause of action). Those claims both depend on the same allegations as the cause of action for writ of mandate and declaratory relief against City, namely, that an enforceable contract exists concerning the Incumbent President Program.

As we have explained, however, no enforceable contract exists concerning the Incumbent President Program. Therefore, we conclude the trial court did not err when it sustained without leave to amend the demurrer of the SDCERS Board to the first and thirteenth causes of action.

## IV

### *The Claims Against City Arising from the Repeal of the Annual Leave Conversion Program*

We next examine the claims alleged against City arising out of the repeal of the Annual Leave Conversion Program.

#### A. *Claims Requiring the Existence of a Valid Contract*

Several of the claims asserted against City by Firefighter Plaintiffs and Local 145 are based on the allegation that City entered into an enforceable contract concerning the Annual Leave Conversion Program. Specifically, without the existence of a valid contract there would be no merit to the claims of Firefighter Plaintiffs and Local 145 against City for (1) breach of contract (eighth cause of action); (2) unconstitutional impairment of contract (fourth cause of action); (3) violation of public policy (sixth cause of action); (4) writ of mandate (second cause of action);[15] and (5) declaratory relief (fourteenth cause of action).

---

[15] As we understand the claim for writ of mandate concerning the Annual Leave Conversion Program, the petition/complaint seeks a writ of mandate only to the extent that such relief is necessary to obtain relief from City's alleged breach or unconstitutional impairment of its alleged contractual obligation to provide benefits under the Annual Leave Conversion Program. Case law permits a party to pursue a writ of mandate under Code of Civil Procedure section 1085 as a means to compel a public agency to take nondiscretionary action necessary to comply with a contractual obligation. (See, e.g., *Glendale, supra,* 15 Cal.3d at pp. 343–345; *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 540 [28 Cal.Rptr.2d

Firefighter Plaintiffs and Local 145 identify (1) the 2002 MOU and (2) ordinance No. O-19126—along with the portion of the municipal code that it enacted—as creating a contractual obligation on the part of City to provide benefits pursuant to the Annual Leave Conversion Program.

### 1. *The 2002 MOU*

As we have discussed, the 2002 MOU (entered into between City and Local 145 pursuant to the MMBA)[16] describes the Annual Leave Conversion Program. City contends that because the Annual Leave Conversion Program was determined to conflict with Internal Revenue Code section 401(a), the 2002 MOU does not create a contractual obligation to maintain the Annual Leave Conversion Program.

City specifically relies on the "Savings Clause" set forth in article 5 of the 2002 MOU, which provides: "This Memorandum is subject to all current and future applicable federal, state and local laws, regulations and the Charter of City of San Diego. [¶] If any part or provision of this Memorandum is in conflict or inconsistent with such applicable provisions of federal, state or local laws or regulations, or is otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part or provisions shall be suspended and superseded by such applicable law or regulations, and the remainder of the Memorandum shall not be affected thereby." City argues that the IRS Compliance Statement establishes that the Annual Leave Conversion Program is in conflict or inconsistent with section 401(a) of the Internal Revenue Code, and therefore the provisions in the 2002 MOU relating to the Annual Leave Conversion Program are suspended and superseded. We agree.

The IRS Compliance Statement provides that the SDCERS was amended to include the Annual Leave Conversion Program "in violation of [Internal Revenue Code] section 401(a)." Consistent with this statement, the petition/complaint pleads that the IRS determined in the IRS Compliance Statement "that the Annual Leave Conversion [Program] did not comply with federal law and IRS Regulations." Therefore, the Savings Clause applies because the Annual Leave Program is "in conflict or inconsistent with . . . federal . . . laws or local laws or regulations" as provided therein.

---

617, 869 P.2d 1142], superseded on another ground as stated in *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077 [29 Cal.Rptr.3d 234, 112 P.3d 623]; *National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279 [105 Cal.Rptr.2d 237].)

[16] Under the MMBA, a memorandum of understanding becomes binding when the governing body of the public agency votes to accept it. (*Glendale, supra,* 15 Cal.3d at p. 335.) We note that the petition/complaint does not allege that the City Council voted to accept the 2002 MOU. However, we need not consider the significance of that omission in light of our conclusion, on other grounds, that the 2002 MOU did not prevent City from repealing the Annual Leave Conversion Program.

Despite the clear language of the IRS Compliance Statement and their own allegation in the petition/complaint, Firefighter Plaintiffs and Local 145 argue that the Savings Clause is *not* in conflict with or inconsistent with Internal Revenue Code section 401(a). They contend that only certain aspects of the Annual Leave Conversion Program led to the determination that its adoption violated section 401(a)—namely, the fact that it was a " 'cashless' benefit,"[17] and that City still could have provided the benefits included in the Annual Leave Conversion Program if it had changed its "cashless" aspect. We disagree.

Regardless of whether the conflict with the Internal Revenue Code was caused only by certain aspects of the Annual Leave Conversion Program, the Savings Clause is triggered when the Annual Leave Conversion Program, as described in the 2002 MOU, is in conflict or inconsistent with federal law. The IRS Compliance Statement clearly states that the Annual Leave Conversion Program adopted by City is in violation of Internal Revenue Code section 401(a). Further, the IRS Compliance Statement required that City amend the SDCERS to remove *"any* provisions relating to the [Annual Leave Conversion Program]" (italics added), not just certain aspects of the program. Therefore, regardless of the fact that City might have designed that program differently to comply with section 401(a), the IRS Compliance Statement establishes that the program, as enacted, did not comply.

Because of the conflict and inconsistency with federal law, the provisions of the 2002 MOU describing the Annual Leave Conversion Program are "suspended and superseded" by operation of the Savings Clause. The 2002 MOU accordingly does not provide a basis for any of the claims requiring the existence of valid contractual obligation on the part of City to provide benefits under the Annual Leave Conversion Program.

### 2. *Ordinance No. O-19126 and Municipal Code Provisions*

Ordinance No. O-19126 (and the portion of the municipal code that it enacted, San Diego Mun. Code, former § 24.1310(c)) provides the second possible source of a contractual obligation cited by Firefighter Plaintiffs with respect to the Annual Leave Conversion Program.

After oral argument in this case, we sought additional briefing from the parties regarding whether there was any legal theory or rule of contractual

---

[17] The record is not sufficiently developed for us to determine whether Firefighter Plaintiffs and Local 145 have accurately described the aspects of the Annual Leave Conversion Program that caused it to be in violation of Internal Revenue Code section 401(a). The IRS Compliance Statement contains only a very brief reference to the problems with the Annual Leave Conversion Program, referring to it as "an impermissible cash or deferred arrangement in violation of section 401(a)."

interpretation under which the Savings Clause in the 2002 MOU acts as a limitation on any alleged contractual rights created by the enactment of ordinance No. O-19126. The parties submitted that briefing, which we have considered in analyzing this issue.

 Under California law, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.) Thus, for example, a note, mortgage and agreement of sale constitute one contract, despite the existence of separate documents, as they are part of the same transaction. (See *Nevin v. Salk* (1975) 45 Cal.App.3d 331, 338 [119 Cal.Rptr. 370].) That the documents were not executed contemporaneously does not change the fact they all relate to the same transaction. (*Ibid.*)

Although there are two documents on which contractual rights allegedly originate (e.g., the 2002 MOU and ord. No. O-19126), we independently conclude that both documents relate to an overarching, singular transaction: the creation of a *qualified*[18] retirement plan that allowed Firefighter Plaintiffs to convert annual leave cash equivalent to retirement service credit on a pretax basis through the Annual Leave Conversion Program.

As we noted above, the 2002 MOU itself was *insufficient* to confer on Firefighter Plaintiffs any rights to the Annual Leave Conversion Program, given the requirement in the then applicable City Charter authorizing the establishment of a pension system by ordinance only. (See, e.g., San Diego City Charter, §§ 141, 144.)

 In order to carry out the terms of the 2002 MOU and provide the Annual Leave Conversion Program as agreed on and expressed therein, City necessarily enacted ordinance No. O-19126. That there was one transaction contemplated by the parties at the time of entering into the 2002 MOU (see *Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 814–815 [26 Cal.Rptr.3d 92] [noting that whether "a document is incorporated into the contract depends on the parties' intent as it existed at the time of contracting"]) is reflected by the terms of that agreement.

Specifically, in article 26, subdivision (B) of the implementation articles of the 2002 MOU, City and Local 145 agreed that City "shall act as soon as possible to make the necessary changes in ordinances, resolutions, rules, policies and grievance procedures to conform to this agreement." Moreover, to ensure that ordinance No. O-19126 reflected the same benefit agreed on in the 2002 MOU, the 2002 MOU also required that "[a]ll such changes shall be

---

[18] See footnote 2, *ante*, for a discussion regarding a qualified retirement plan.

submitted to Local 145 prior to their submittal for implementation to insure that the proposed changes *are consistent with the agreement.*" (Italics added.)

The recitals of ordinance No. O-19126 also support our conclusion that the 2002 MOU and ordinance No. O-19126 relate to the same subject matter and were executed by the parties as part of a single transaction. Specifically, ordinance No. O-19126 notes it was enacted after City's "Management Team agreed to implement a number of revisions to the Retirement System" as provided in the 2002 MOU because ordinance No. OO-19121 (e.g., O-2003-67) "did not include the revisions to the Retirement System giving members represented by Firefighters Local 145 the ability to convert on a pre-tax basis a Member's Unused Annual Leave accrued after July 1, 2002," and thus ordinance No. O-19126 was needed to "amend the San Diego Municipal Code to reflect the additional revisions to the Retirement System not set forth in Ordinance No. OO-19121 (O-2003-67)."[19]

Because ordinance No. O-19126 was an inherent part of the 2002 MOU and was specifically enacted to implement the Annual Leave Conversion Program agreed to by the parties in the 2002 MOU (see *Neptune Society Corp. v. Longanecker* (1987) 194 Cal.App.3d 1233, 1250 [240 Cal.Rptr. 117] [affirming award of attorney fees based on a provision in the promissory notes because the "promissory notes were inherent parts of the [franchise] agreement, which is the subject matter of the litigation . . ."]), we further conclude that the Savings Clause in the 2002 MOU applies to ordinance No. O-19126.

Indeed, it would make little sense, on the one hand, to enforce the Savings Clause in the 2002 MOU negotiated by the parties, which subsequently applied to suspend the Annual Leave Conversion Program after it was determined by the IRS to contravene federal law, while on the other hand not apply the Savings Clause to ordinance No. O-19126 when that ordinance was part of one transaction (see § 1642), implemented the 2002 MOU and when the parties clearly contemplated at the time of contracting that if any provision (including the Annual Leave Conversion Program) contravened "applicable provisions of federal, state or local laws or regulations, or [was] otherwise held to be invalid or unenforceable by any court of competent jurisdiction," that provision would be "suspended and superseded."

Thus, we conclude the Savings Clause in the 2002 MOU properly applied to "suspend" (e.g., terminate) the Annual Leave Conversion Program as provided in the 2002 MOU *and* as implemented by ordinance No. O-19126.

---

[19] We also note that the 2002 MOU and ordinance No. O-19126 each provide nearly identical descriptions of the Annual Leave Conversion Program, which further supports our conclusion that the two documents are part of one overarching transaction.

We therefore conclude the trial court did not err when it sustained without leave to amend City's demurrer to the claims of Firefighter Plaintiffs and Local 145 for (1) breach of contract (eighth cause of action); (2) unconstitutional impairment of contract (fourth cause of action); (3) violation of public policy (sixth cause of action); (4) writ of mandate (second cause of action); and (5) declaratory relief (fourteenth cause of action).[20]

### B. Promissory Estoppel Claim

We next consider the promissory estoppel claim against City arising out of the Annual Leave Conversion Program (sixteenth cause of action).

 "Promissory estoppel is 'a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced.' [Citation.]" (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63].) " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. . . .' [Citations.]" (*Ibid.*) "To be binding, the promise must be clear and unambiguous. [Citations.]" (*Lange v. TIG Ins. Co.* (1998) 68 Cal.App.4th 1179, 1185–1186 [81 Cal.Rptr.2d 39].)

Here, we conclude that the promissory estoppel claim fails as a matter of law (see *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]) because City did not promise Firefighter Plaintiffs they could participate in the Annual Leave Conversion Program even if that program was found to be noncompliant, which turned out to be the case. (See *Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1566 [69 Cal.Rptr.3d 612] [rejecting promissory estoppel claim of taxi drivers who purchased clean air vehicles after the city passed a resolution granting certain benefits to drivers of such vehicles (e.g., an incentive program) because the "facts do not show that the [c]ity promised not to amend the incentive program"].)

---

[20] In light of our conclusion, which involves a pure question of law on undisputed facts (see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24 [44 Cal.Rptr.2d 370, 900 P.2d 619] [noting a court has discretion to consider a pure question of law raised for the first time on appeal]; *Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907 [124 Cal.Rptr.3d 144] [same]), we deem it unnecessary to address City's alternate arguments that (i) ordinance No. O-19126 and San Diego Municipal Code former section 24.1310(c), did not function to add the Annual Leave Conversion Program to SDCERS because there was no "majority" vote of the SDCERS membership approving that amendment to SDCERS, as required by the City's charter and (ii) the Annual Leave Conversion Program was suspended and thus terminated by a failure of an express condition subsequent, viz., the approval of the Program by the IRS. (See, e.g., *Betts, supra,* 21 Cal.3d at p. 863.)

In fact, the Savings Clause in the 2002 MOU expressly provided that the 2002 MOU was *"subject to* all current and *future* applicable federal, state and local laws, regulations and the Charter of City of San Diego" (italics added) and that if any provision in the 2002 MOU was found to conflict with or be inconsistent with such applicable laws, the provision(s) would be "suspended and superseded."

In addition, the purpose of the doctrine of promissory estoppel is " 'to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. If the promisee's performance was requested at the time the promisor made his [or her] promise and that performance was bargained for, the doctrine is inapplicable.' [Citation.] Accordingly, a plaintiff cannot state a claim for promissory estoppel when the promise was given in return for proper consideration. The claim instead must be pleaded as one for breach of the bargained-for contract." (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 275 [129 Cal.Rptr.3d 467].)

Here, the parties in the 2002 MOU set out their agreement to create the Annual Leave Conversion Program. "A written instrument is presumptive evidence of a consideration" (Civ. Code, § 1614), and in any event all the law requires for sufficient consideration is the proverbial "peppercorn" (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808–809, fn. 5 [48 Cal.Rptr.2d 747]). Our review of the 2002 MOU shows there was more than adequate consideration to support the parties' promises in that agreement, and thus for this separate and independent reason we conclude the trial court properly sustained without leave to amend City's demurrer to the promissory estoppel claim of Firefighter Plaintiffs and Local 145.

## C. *Negligence Claim*

As was the case with the negligence claim arising from the repeal of the Incumbent President Program, the negligence claim (tenth cause of action) against City by Firefighter Plaintiffs and Local 145 arising from the repeal of the Annual Leave Conversion Program is based on a theory of vicarious liability under Government Code section 815.2, subdivision (a) for the acts or omissions of City's employees.

Firefighter Plaintiffs and Local 145 allege that unspecified City employees failed to use due care in implementing the promised pension benefits. More specifically, with respect to the Annual Leave Conversion Program, we understand Firefighter Plaintiffs and Local 145 to be alleging (or proposing to amend the petition/complaint to allege) that City employees failed to use due care to put in place a program that complied with Internal Revenue Code

section 401(a), and that they negligently represented to the public that the Annual Leave Conversion Program was legally sound.

However, as was the case with similar claims made with respect to the Incumbent President Program, City is immune because these claims amount to an attempt to impose liability on City for "an injury caused by adopting or failing to adopt an enactment" (Gov. Code, § 818.2) and for "injury caused by misrepresentation by an employee" (*id.*, § 818.8).

We therefore conclude the trial court did not err when it sustained without leave to amend the demurrer to the negligence claim against City arising out of the Annual Leave Conversion Program.

V

*Claims Against the SDCERS Board Arising from the Annual Leave Conversion Program*

A. *Breach of Contract Claim*

Firefighter Plaintiffs and Local 145 assert a breach of contract claim against the SDCERS Board (ninth cause of action) premised on the allegation that when the SDCERS accepted the forms that Firefighter Plaintiffs filled out to participate in the Annual Leave Conversion Program, the SDCERS Board entered into a contractual obligation with Firefighter Plaintiffs to provide benefits under the Annual Leave Conversion Program. According to the petition/complaint, the SDCERS Board breached that contract when the SDCERS stopped providing benefits under the Annual Leave Conversion Program upon the repeal of the program.

As one basis for demurrer, the SDCERS Board contends that its acceptance of the forms filled out by Firefighter Plaintiffs did not give rise to a contractual obligation on its part to provide benefits under the Annual Leave Conversion Program because the SDCERS Board does not have the authority to create a right to receive benefits under the SDCERS. We agree.

As we established in *City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69, 79 [111 Cal.Rptr.3d 418] (*City of San Diego*), "[t]he granting of retirement benefits is a legislative action within the exclusive jurisdiction of the City. ([San Diego] City charter, art. IX, § 141.)" "The scope of the board's power as to benefits is limited to administering the benefits set by the City." (*Id.* at p. 80.) Therefore, the SDCERS Board did not have the power to enter into any contract creating the right to receive benefits under the Annual Leave Conversion Program. We

conclude the trial court did not err when it sustained without leave to amend the demurrer to the ninth cause of action.

### B. *Unconstitutional Impairment of Contract*

Firefighter Plaintiffs and Local 145 also assert a claim against the SDCERS Board for unconstitutional impairment of contract (fourth cause of action). Although no acts by the SDCERS Board are identified in the petition/complaint's pleading of this claim, Firefighter Plaintiffs and Local 145 explain in their briefing that the SDCERS Board is liable for unconstitutional impairment of contract regarding the Annual Leave Conversion Program because the SDCERS Board president signed the IRS Compliance Statement, and the SDCERS then stopped providing benefits under the Annual Leave Conversion Program.

A cause of action for unconstitutional impairment of contract is based on United States Constitution, article I, section 10, clause 1, which provides in part that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts" and on California Constitution, article I, section 9, which provides in part that "[a] law impairing the obligation of contracts may not be passed."

The SDCERS Board does not pass laws; it administers the retirement program created by City. (See *City of San Diego, supra*, 186 Cal.App.4th at pp. 79–80.) Although the IRS apparently required that a representative of the SDCERS Board sign the IRS Compliance Statement, we conclude that act did not transform the SDCERS Board into an entity that enacts the provisions of the SDCERS. The trial court therefore properly sustained the demurrer of the SDCERS Board to the unconstitutional impairment of contract claim arising from the repeal of the Annual Leave Conversion Program.

### C. *Declaratory Relief Claim Regarding the Annual Leave Conversion Program*

Firefighter Plaintiffs and Local 145 included the SDCERS Board as a defendant in their cause of action for declaratory relief regarding the Annual Leave Conversion Program (fourteenth cause of action). As we have explained, that cause of action seeks the following declarations: (1) that ordinance No. O-19740 is an unconstitutional impairment of contract and (2) that Firefighter Plaintiffs are entitled to benefits under the Annual Leave Conversion Program.

The SDCERS Board argues that to the extent the declaratory relief cause of action raises the issue of unconstitutional impairment of contract arising from

ordinance No. O-19740, it is not a proper defendant because it did not enact that ordinance or any other law that could cause an unconstitutional impairment. We agree.

In addition, given our conclusion *ante* sustaining City's demurrer on the basis that the Savings Clause in the 2002 MOU applied to "suspend" and thus terminate the Annual Leave Conversion Program implemented by ordinance No. O-19126, we conclude for this separate reason that the trial court properly sustained without leave to amend the SDCERS Board's demurrer to the declaratory relief claim.

### D. *Writ of Mandate Regarding the Annual Leave Conversion Program*

The SDCERS Board is named in the cause of action in which Firefighter Plaintiffs and Local 145 seek a writ of mandate concerning the Annual Leave Conversion Program (second cause of action). The specific relief that Firefighter Plaintiffs and Local 145 seek regarding the SDCERS Board is an order compelling the SDCERS Board to credit Firefighter Plaintiffs' retirement accounts pursuant to the Annual Leave Conversion Program.

The SDCERS Board argues in its demurrer that the writ relief sought is not available because there is no clear and present duty that can be enforced by the court. "What is required to obtain writ relief is a showing by a petitioner of '(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . .' " (*Santa Clara County Counsel Attys. Assn. v. Woodside, supra,* 7 Cal.4th at pp. 539–540.) As the SDCERS Board points out, its role is limited to administering the retirement system created by City. (See *City of San Diego, supra,* 186 Cal.App.4th at pp. 79–80.) City has repealed the Annual Leave Conversion Program by enacting ordinance No. O-19740. Therefore, there is no clear and present duty on the part of the SDCERS Board to provide benefits under the Annual Leave Conversion Program.

Although the petition/complaint—through the causes of action for writ of mandate against City—seeks the rescission of the ordinance that repealed the Annual Leave Conversion Program, that rescission is only a *future* possibility: "[A]n applicant for a writ of mandate must show a *present* duty for the performance of the act sought to be compelled." (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 709 [56 Cal.Rptr.3d 102], italics added.) Because Firefighter Plaintiffs and Local 145 cannot make that showing, we conclude the trial court properly sustained the demurrer to the writ of mandate claim against the SDCERS concerning the Annual Leave Conversion Program.

E. *Ditomaso's Claim for Breach of Fiduciary Duty*

The final cause of action we consider is Ditomaso's claim against the SDCERS Board for breach of fiduciary duty (twelfth cause of action). Ditomaso alleges that the SDCERS Board breached its fiduciary duty to him, as a member of the SDCERS, by allowing him to participate in and rely on the Annual Leave Conversion Program when—contrary to Ditomaso's knowledge—that program did not comply with Internal Revenue Code section 401(a). According to Ditomaso, the SDCERS Board induced his justifiable reliance on the Annual Leave Conversion Program when he made retirement decisions.

The SDCERS Board argues that it did not have a fiduciary duty to determine and communicate to its members whether the provisions of the SDCERS, enacted by City, complied with section 401(a) of the Internal Revenue Code. It argues that "[t]he City, not [the] SDCERS [Board], was required to ensure the legality of the laws it was enacting to grant benefits to its employees" and thus, the "SDCERS [Board] had no authority to either grant, take away, refuse to pay for, or allow members to participate in, the benefits adopted by the City." According to the SDCERS Board, because its duty was merely to administer those retirement benefits established by City, it could not have breached a duty to Ditomaso by allowing him to participate in the Annual Leave Conversion Program. We agree.

As we have explained, the role of the SDCERS Board is to administer the SDCERS as enacted by City. (See *City of San Diego, supra*, 186 Cal.App.4th at pp. 79–80.) In light of that limited role, Ditomaso has cited no authority, either in case law, in the City Charter or the municipal code, indicating that the SDCERS Board breached a duty to Ditomaso by permitting him to participate in the Annual Leave Conversion Program.[21]

Ditomaso contends that he could amend his breach of fiduciary duty claim to allege that the SDCERS Board should have attempted to save the Annual Leave Conversion Program from violating Internal Revenue Code section

---

[21] Similar to the argument we have already discussed and rejected in connection with the cause of action for unconstitutional impairment of contract, Ditomaso's briefing in support of his breach of fiduciary claim focused on the fact that the SDCERS Board president signed the IRS Compliance Statement. That fact does not change our analysis, however; regardless of whether the IRS required the signature of the SDCERS Board president on the IRS Compliance Statement along with that of a City representative, City alone has the authority to determine the provisions of the SDCERS, with the SDCERS Board merely administering those provisions.

401(a) by demanding that City pay into the SDCERS the "cash value of the annual leave benefit used to purchase service credits."[22]

But City and not the SDCERS Board establishes the provisions of the SDCERS. Therefore, Ditomaso has no legal basis for an allegation that the SDCERS Board had a duty to demand that City put into place an Annual Leave Conversion Program that would not conflict with Internal Revenue Code section 401(a). Because Ditomaso has not identified a fiduciary duty on the part of the SDCERS Board that is implicated by this case, we conclude the trial court properly sustained without leave to amend the SDCERS Board's demurrer to Ditomaso's breach of fiduciary duty claim.

## DISPOSITION

We affirm the judgment entered following the order sustaining without leave to amend the demurrers of City and the SDCERS Board. City and the SDCERS Board are entitled to recover their costs of appeal.

McIntyre, J., concurred.

**IRION, J.,** Dissenting.—In my view, the trial court erred in sustaining the demurrer to (1) the contract-based and promissory estoppel causes of action against the City of San Diego (City) arising out of the City's repeal of the "Annual Leave Conversion Program," and (2) the cause of action for declaratory relief against the San Diego City Employees' Retirement System (SDCERS) board concerning the Annual Leave Conversion Program.[1] Accordingly, I dissent.

A. *The Contractual Obligations Created by the City's Enactment of Ordinance No. O-19126 Are Not Terminated by the 2002 MOU's Savings Clause*

My colleagues acknowledge the long line of cases establishing that a public agency's pension plan, enacted into law, gives rise to contractual obligations on the part of the public agency. (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 864 [148 Cal.Rptr. 158, 582 P.2d 614] (*Betts*); *Miller v. State of California* (1977) 18 Cal.3d 808, 814 [135 Cal.Rptr. 386, 557 P.2d 970]; *Allen v. City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765]; *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 855 [179 P.2d 799]

---

[22] As we have explained, the record is not sufficiently developed for us to determine whether the amendments to the Annual Leave Conversion Program that appellants identify would have saved that program from being out of compliance with Internal Revenue Code section 401(a).

[1] For the sake of clarity, I will use the same defined terms identified in the majority opinion when referring to the applicable documents, parties, and provisions of the SDCERS.

[collectively the "*Betts* line of cases"].) Under the *Betts* line of cases, "[a] public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity. [Citation.] The employee does not obtain, prior to retirement, any absolute right to fixed or specific benefits, but only to a 'substantial or reasonable pension.' " (*Betts*, at p. 863.) The *Betts* line of cases establishes that "there is a strict limitation on the conditions which may modify the pension system in effect during employment. . . . 'An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, *and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.*' " (*Betts*, at p. 864.)

The Annual Leave Conversion Program became part of the City's pension plan (i.e., the SDCERS) through the enactment of ordinance No. O-19126 (and the corresponding portion of the municipal code, San Diego Mun. Code, former § 24.1310(c)). Normally, this would give rise to contractual obligations on the part of the City which, according to the *Betts* line of cases, could be modified *only* if the changes are reasonable and any resulting disadvantages to affected employees were accompanied by comparable new advantages. (*Betts, supra*, 21 Cal.3d at p. 864.) My colleagues conclude, however, that this action should not have proceeded past demurrer to a factual determination of whether the City's modifications to the SDCERS were reasonable and accompanied by comparable new advantages because, in their view, the "Savings Clause" in the 2002 memorandum of understanding (MOU) renders ordinance No. O-19126 and the municipal code ineffective to create any contractual rights under the *Betts* line of cases. I disagree.

The Savings Clause appears in the 2002 MOU, not in ordinance No. O-19126 or the municipal code. It provides as follows: "If any part or provision of this [2002 MOU] is in conflict or inconsistent with such applicable provisions of federal, state or local laws or regulations, or is otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part or provisions shall be suspended and superseded by such applicable law or regulations, and the remainder of the [2002 MOU] shall not be affected thereby." My colleagues read this language as an agreement (by Local 145 on behalf of its members) that, in the event the Annual Leave Conversion Program is

determined to conflict with or be inconsistent with provisions of federal law, the City's pension laws enacted to implement the Annual Leave Conversion Program will not be read to create any contractual obligations under the *Betts* line of cases. Specifically, the majority decides that the Savings Clause "applies to" ordinance No. O-19126 because the 2002 MOU and the enactment of ordinance No. O-19126 are "part of a single transaction," and that therefore the Savings Clause "properly applied to 'suspend' (e.g., terminate) the Annual Leave conversion Program . . . as implemented by ordinance No. O-19126."[2] (Maj. opn., *ante*, at p. 617.)

I find no support for the majority's conclusion that the Savings Clause applies to ordinance No. O-19126 because, as I will explain, that interpretation of the Savings Clause (1) is not supported by its plain language and (2) impermissibly creates a method of terminating a portion of the SDCERS that is in direct conflict with the method required by the City's charter.

First, the plain language of the Savings Clause does not support my colleagues' interpretation because the Savings Clause, by its own terms, operates to suspend and supersede "any part or provision *of this [2002 MOU]*." (Italics added.) The Savings Clause says nothing about suspending and superseding an ordinance or municipal code provision enacted *as a result of the 2002 MOU*. The 2002 MOU and ordinance No. O-19126 are part of the "same transaction" only in that ordinance No. O-19126 was enacted to fulfill the City's agreement in the 2002 MOU to implement the Annual Leave Conversion Program. (Maj. opn., *ante*, at p. 616.) This causal connection does not, however, transform the plain language of the Savings Clause, which deals with suspension of *the 2002 MOU's provisions*, into a provision that deals with suspension of *the City's pension laws* enacted as a result of the agreements in the 2002 MOU.[3]

---

[2] The majority does not specify whether they believe that the Savings Clause (1) *automatically* effects a retroactive repeal of ordinance No. O-19126 and the corresponding portion of the municipal code or, (2) more sensibly, allows the City to enact an ordinance retroactively repealing the laws that established the Annual Leave Conversion Program without breaching a contractual obligation. In my view, either interpretation is unreasonable. I note that the majority simply assumes unjustifiably, and without analysis, that the term "suspended and superseded" in the Savings Clause refers to *retroactive* suspension, rather than *prospective* suspension, of the 2002 MOU's provisions.

[3] An additional problem with relying on the 2002 MOU's Savings Clause to justify the City's retroactive termination of the Annual Leave Conversion Program in 2008 is that the 2002 MOU expired by its own terms three years earlier in 2005, and the record contains no indication that a collective bargaining agreement with the same terms was in effect in 2008. Further, as the majority acknowledges, the record contains no indication that the City Council ever voted to adopt the 2002 MOU, so that it is unclear whether the 2002 MOU—including the Savings Clause—ever became a binding agreement.

Second, the majority's interpretation of the Savings Clause is contrary to the requirement in the City's charter that the provisions of the SDCERS be enacted by ordinance and that any amendment be approved by a majority vote of the SDCERS members. (San Diego City Charter, art. IX, §§ 141, 143.1.)[4] The terms of the Savings Clause cannot be applied to ordinance No. O-19126 and the corresponding portion of the municipal code because doing so would insert terms into the pension laws comprising the SDCERS that were not enacted by ordinance and were not approved by a majority vote of the SDCERS membership. Further, if the Savings Clause is read to allow an automatic retroactive termination of the Annual Leave Conversion Program, as suggested by the majority, that method of amending or repealing a provision of the SDCERS would directly conflict with the methodology set forth in the City's charter for doing so—namely, by enacting an ordinance and obtaining approval in a majority vote of the SDCERS membership. It is absurd to interpret the Savings Clause in the 2002 MOU as creating an alternative method for terminating a portion of the SDCERS when that method is in direct conflict with the requirements of the City's charter. A "charter city may not act in conflict with its charter" and "[a]ny act that is violative of or not in compliance with the charter is void." (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171 [36 Cal.Rptr.2d 521, 885 P.2d 934].) Therefore, it is unreasonable to conclude that the City acted in conflict with its charter by agreeing to allow retroactive termination of the Annual Leave Conversion Program by virtue of the Savings Clause rather than by a validly enacted ordinance and majority vote of the SDCERS membership.[5]

A much more reasonable reading of the Savings Clause is that it functions as a standard severability clause for the 2002 MOU, which is a 65-page document setting forth numerous agreements concerning the terms and conditions of employment of the members of Local 145. According to established law, the object of a contract must be lawful (Civ. Code, § 1596), and "[w]here a contract has but a single object, and such object is unlawful, whether in whole or in part, . . . the *entire* contract is void" (Civ. Code, § 1598, italics added). Under Civil Code section 1599, "[w]here a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest . . . ," but "Civil Code section 1599 grants courts the power, *not the duty*, to sever contracts in order to avoid an inequitable windfall or

---

[4] Both of these provisions of the City's charter are acknowledged and discussed by my colleagues in the context of the "Incumbent President Program." (Maj. opn., *ante*, at pp. 607–608.)

[5] Indeed, because a majority vote of the SDCERS membership is required to establish the terms of the SDCERS, it would be unreasonable to conclude that San Diego City Firefighters, Local 145, IAFF, AFL-CIO (Local 145) could bind its members to those terms by virtue of the 2002 MOU without giving them an opportunity to vote as required by the City's charter.

preserve a contractual relationship where doing so would not condone illegality." (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 992 [70 Cal.Rptr.3d 727, 174 P.3d 741], italics added.) According to the Savings Clause, it provides that "the remainder of the [2002 MOU] shall not be affected . . . ." Therefore, the most obvious purpose of the Savings Clause is to suspend and supersede any unlawful portion of the 2002 MOU so that the rest of 2002 MOU will not be at risk of being declared void.

My colleagues state that "it would make little sense" to apply the Savings Clause to the 2002 MOU but not apply it to ordinance No. O-19126. (Maj. opn., *ante,* at p. 617.) Again, I disagree. There are several scenarios where the Savings Clause would have meaning without applying it to ordinance No. O-19126. First, had the City discovered before enacting the Annual Leave Conversion Program into law that it conflicted with the Internal Revenue Code, the Savings Clause would have saved the City from being compelled, pursuant to its agreement in the 2002 MOU, to enact the Annual Leave Conversion Program as part of the SDCERS. (*Huntington Beach Police Officers' Assn. v. City of Huntington Beach* (1976) 58 Cal.App.3d 492, 496 [129 Cal.Rptr. 893] ["A written memorandum of understanding negotiated pursuant to the [Meyers-Milias-Brown] Act is, upon approval of the city council, binding upon the parties and performance of the city's obligations under the agreement may be enforced by the traditional mandate proceeding to compel performance of a ministerial duty or to correct an abuse of official discretion."].) Second, without the Savings Clause, if a majority vote of the SDCERS membership failed to approve ordinance No. O-19126, the City would still have been obligated under the 2002 MOU to implement the Annual Leave Conversion Program, even when implementation would conflict with the requirements of the City's charter. Third, when, as here, the Annual Leave Conversion Program was determined to conflict with IRS requirements *after* its enactment, the Savings Clause operated to lift the City's obligation *under the 2002 MOU* to maintain the Annual Leave Conversion Program even when doing so would threaten its status as a qualified retirement plan. Because of the Savings Clause, the City was free to save the SDCERS's status as a qualified retirement plan by undertaking modifications of its pension laws within the confines set by the *Betts* line of cases.[6]

In sum, the most reasonable interpretation of the Savings Clause is that it suspends the portions of the 2002 MOU requiring the City to provide the Annual Leave Conversion Program, but it does not purport to render void

---

[6] I express no view on whether, had this litigation been permitted to proceed past demurrer, the City would have been able to establish that it acted permissibly under the *Betts* line of cases by retroactively repealing the Annual Leave Conversion Program. That determination would have required further development in the trial court of the applicable facts.

ordinance No. O-19126 and the corresponding portion of the municipal code. Once enacted, those municipal pension laws became subject to the *Betts* line of cases, under which a public agency's pension laws give rise to actionable contractual obligations.

B. *There Is No Merit to the City's Contention That Ordinance No. O-19126 Was Not Approved by a Majority Vote of the SDCERS Members as Required by the City's Charter and Thus Did Not Give Rise to Actionable Contractual Obligations*

Because the majority opinion relies on the Savings Clause to invalidate ordinance No. O-19126, it did not consider the City's contention that ordinance No. O-19126 was not validly approved by a majority vote of the SDCERS membership and thus could not have given rise to contractual obligations. My view of this case requires that we decide whether ordinance No. O-19126 was approved by a majority vote of the SDCERS members, and I accordingly set forth my analysis of that issue.

My analysis begins with the relevant language of the City's charter. In 2002, when ordinance No. O-19126 was adopted, the City's charter stated that "[n]o ordinance amending the retirement system which affects the benefits of any employee under such retirement system shall be adopted without the approval of a majority vote of the members of said system." (San Diego City Charter, art. IX, § 143.1.) As shown by documents that were judicially noticed by the trial court, the entire SDCERS membership was given an opportunity to vote on whether to adopt the Annual Leave Conversion Program. Out of 10,311 persons eligible to vote, 2,228 votes were cast, with 2,193 votes in favor and 35 votes against adopting the amendments to the SDCERS. Thus, the Annual Leave Conversion Program was approved by a majority *of those persons voting.* However, because only 2,193 votes in favor were cast out of the 10,311 persons eligible to vote, the Annual Leave Conversion Program was not approved by a majority of the *entire* SDCERS membership.

According to the City, the result of the vote was not sufficient to approve the Annual Leave Conversion Program, because in referring to "the approval of a majority vote of the members of [the SDCERS]" (San Diego City Charter, art. IX, § 143.1), the City's charter requires an approval of the majority of the *entire* SDCERS membership, not just the approval of the majority of the SDCERS members who cast a vote.

An analysis of the City's argument requires an interpretation of the City's charter. " 'The same rules of statutory interpretation that apply to statutory provisions also apply to local charter provisions.' " (*Bohbot v. Santa Monica*

*Rent Control Bd.* (2005) 133 Cal.App.4th 456, 462 [34 Cal.Rptr.3d 827].) The court's "sole objective is to ascertain and effectuate legislative intent" and the court must "look first to the language of the charter, giving effect to its plain meaning." (*Domar Electric, Inc. v. City of Los Angeles, supra,* 9 Cal.4th at p. 172.)

The relevant phrase in the City's charter is "majority vote of the members of said [(SDCERS)] system." (San Diego City Charter, art. IX, § 143.1.) Applying a purely grammatical approach to the phrase to ascertain its plain meaning, the word "majority" acts as an adjective to modify the noun "vote." The prepositional phrase "of the members of said [(SDCERS)] system" modifies the word "vote," describing the universe of persons who may participate in the vote. Therefore, according to the plain meaning of the words, the City's charter requires a majority vote of the SDCERS members who participate in the election. It does *not* require a vote of approval by a majority of the entire SDCERS membership. (See *Lake County Sheriff's Merit Bd. v. Buncich* (Ind.Ct.App. 2007) 869 N.E.2d 482, 485 [in the context of an election to a police merit board, using grammatical approach to interpret the phrase " 'majority vote of the members of the county police force' " to require only a " 'majority vote' " of the members who participate in the election].)

This interpretation of the plain meaning of the words is consistent with the definition of the word "majority" in the context of voting as described in Black's Law Dictionary. As described therein, "[a] 'majority' without further qualification usu[ally] means a simple majority." (Black's Law Dict. (9th ed. 2009) p. 1040, col. 2.) In turn, a "simple majority" means "[a] numerical majority of those actually voting. . . . Absent members, members who are present but do not vote, blanks, and abstentions are not counted." (*Id.* at p. 1041, col. 1.) In contrast, the term "absolute majority" means "[a] majority of all those who are entitled to vote in a particular election, regardless of how many voters actually cast ballots." (*Id.* at p. 1040, col. 2.) The City's charter did not qualify the word "majority" by indicating that it meant an *absolute* majority, and therefore the term "majority vote" at issue here plainly means a majority of those actually voting.[7]

---

[7] The City supports its interpretation by relying on two cases, *Fisher v. Board of Police Commissioners* (1965) 236 Cal.App.2d 298 [45 Cal.Rptr. 859] and *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322 [93 Cal.Rptr.3d 39], in which the issue was how many members of a governing board were required to approve a proposal. *Fisher* concerned a city charter provision requiring that any order or resolution of the board of police commissioners " 'be adopted by a *majority of its members*.' " (*Fisher,* at p. 300, italics added.) As *Fisher* interpreted this language, the charter required a vote of approval by a majority of the total number of board members, regardless of how many board members were present for the vote. Because *Fisher* construed the phrase "adopted by a majority of its members," and no such similar language appears in the provision of the City's charter at issue here, *Fisher* is not

In sum, there is no merit to the City's argument that the phrase "majority vote of the members of said [(SDCERS)] system" requires that an affirmative vote be cast by a majority of the entire SDCERS membership. I would therefore conclude that the City failed to establish that the Annual Leave Conversion Program was not validly adopted through ordinance No. O-19126 as part of the SDCERS.

## C. *Because a Contractual Obligation Arose Under the* Betts *Line of Cases Based on the City's Enactment of Ordinance No. O-19126, the Trial Court Should Not Have Sustained the City's Demurrer to the Second, Fourth, Sixth, Eighth, Fourteenth and Sixteenth Causes of Action and the SDCERS Board's Demurrer to the Fourteenth Cause of Action*

As I have discussed, in my analysis neither the 2002 MOU's Savings Clause nor the requirement of a majority vote of the SDCERS members to approve an amendment to the SDCERS invalidates the City's contractual obligations arising under the *Betts* line of cases based on the enactment of ordinance No. O-19126. Therefore, the City's demurrer did not succeed in establishing the absence of a valid contract for the contract-based causes of action against the City. I would therefore reverse the trial court's ruling sustaining the City's demurrer to the causes of action by the firefighter plaintiffs and Local 145 against the City for (1) breach of contract (eighth cause of action); (2) unconstitutional impairment of contract (fourth cause of action); (3) violation of public policy (sixth cause of action); (4) writ of mandate (second cause of action); and (5) declaratory relief (fourteenth cause of action).

I would also reverse the order sustaining the demurrer on the City's promissory estoppel cause of action relating to the repeal of the Annual Leave Conversion Program (sixteenth cause of action). My colleagues conclude that the demurrer was properly sustained on that cause of action because the Savings Clause established that the City did not promise to maintain the Annual Leave Conversion Program in the event it conflicted with federal law. As I disagree with that interpretation of the Savings Clause, I cannot agree with my colleagues' analysis of the promissory estoppel cause of action. The majority opinion did not discuss the theory advanced by the

---

relevant to the instant analysis. *County of Sonoma* construed Government Code section 25005, which states that "[n]o act of [a county board of supervisors] shall be valid or binding unless a majority of all the members concur therein." As *County of Sonoma* explained, because the statute specifically refers to " 'a majority of all the members' . . . , valid acts require the affirmative vote of the board's *entire* membership." (*County of Sonoma,* at p. 346, fn. 11, italics added.) The analysis in *County of Sonoma* is not applicable here because the City's charter does not state that "a majority of all" the SDCERS membership is required for an affirmative vote on a proposal, and instead refers to a "majority vote" of the SDCERS membership, which as explained above, plainly means a simple majority of the votes cast.

City in favor of its demurrer to the promissory estoppel cause of action, which is that it would be contrary to public policy and the City's charter to allow a promissory estoppel claim based on the Annual Leave Conversion Program because ordinance No. O-19126 was not approved by a majority vote of the SDCERS membership. The City's theory for its demurrer fails because, as I have concluded, ordinance No. O-19126 was approved by the requisite majority vote of the SDCERS membership.

In light of my view that the contract-based causes of action against the City arising from the repeal of the Annual Leave Conversion Program should have survived demurrer, I would also reverse the order sustaining the SDCERS Board's demurrer to the declaratory relief cause of action concerning the Annual Leave Conversion Program (fourteenth cause of action). That cause of action sought a declaration, among others, that the firefighter plaintiffs are entitled to benefits under the Annual Leave Conversion Program. The SDCERS Board's demurrer to that portion of the declaratory relief cause of action relied on the City establishing that the Annual Leave Conversion Program did not constitute a binding obligation of the City. As I have concluded that the City's demurrer did *not* succeed in establishing that principle, I would also conclude that the SDCERS Board's demurrer to the fourteenth cause of action for declaratory relief is without merit.